Robinson, J.
Feeling conscious that the character and importance of this case, and the extent of the interests involved, exact from the court the most diligent and prompt consideration, after a trial protracted ■through two weeks, and hearing the elaborate arguments of the learned counsel engaged in the case, I have hastened to bestow upon its consideration such time and attention as a regard for the other multifarious judicial duties and claims upon me, while daily holding court, has permitted. I am conscious that from such intermittent considerations of the subjects involved, I may fail to give due weight to some portions of the arguments presented by the eminent counsel who have so ably managed the cause, and may possibly be somewhat influenced by preconceived impressions of the law governing the case from having, before being honored with my present office, been engaged as advocate upon some one side or other of the questions presented, or from having heretofore ex- *486 presad judicially opinions in respect to them. But having so far as may be divested myself of remembrance of such impressions or convictions, I have again endeavored to renew my consideration of the merits of the controversy and give my present convictions on the-points hereinafter discussed.
That which is first suggested on the part of the defendant is, that this court has no jurisdiction to entertain the action, so far as to afford any equitable relief by way of a preventive order of injunction restraining the defendants from constructing their railroad in front of the plaintiff’s premises, Nos. 7 and 9 Front street, in this city. Although my conclusions upon the merits of the controversy are.in the defendant’s favor, yet the-proposition is of such a character, that if tenable, such a judgment would be of little avail, and it necessarily requires- an expression of opinion upon its validity. The objection is based upon a. pro vision in the act of April 22, 1867, chapter 489, entitled “An act to provide for the construction of an experimental line of railway in the counties of New York and Westchester,” authorizing the West Side and Yonkers Patent Railway Company to proceed with the construction of' an elevated railway in the manner therein indicated.. The act has no reference to any railroad in or through Front street, but related solely to one to be constructed on the west side of the city, running exclusively through Greenwich street to the Ninth avenue and thence northward. Section 11 of that act requires that “All applications for injunctions in any manner relating to said railway shall be made only to the supreme court.” The present controversy has no reference to the particular railroad authorized by that act, except so far as (it is claimed), the above provision is applicable to the present defendants, who have so oceeded to all the rights and privileges of the West Side and Yonkers Patent Railway Company, which it *487 is claimed have become attached to their own chartered rights, to establish a railroad in that and other localities, with like special exemption from any such control of this court.
The constitution of 1864, article 8, section 3, provided as follows: “All corporations shall have the right to sue and shall be subject to be sued in all courts in like cases as natural persons.” The amendments to the constitution of 1870 in no way interfered with this provision, and by the judiciary article 6, section 12, confirmed to this court (and other city courts of record), its existing powers and jurisdiction, with such further civil and criminal jurisdiction as might be conferred by law. It then had, among various other powers, general jurisdiction at law and in equity of all domestic corporations transacting business or established by law in this city; including the power to make a decree for preventive relief by injunction ¿gainst a threatened injury, as prayed for in this action.
By the act of 1873, chap. 239 (p. 180 of Bess. Laws), it was enacted that this court (with others) should thenceforth have original jurisdiction at law and in equity concurrent and co-extensive with the supreme court, in all civil actions and of all proceedings of a special nature, which embraced all civil remedies.
These constitutional provisions and the act of 1873, passed in accordance with them, would seem to effectually dispose of this preliminary question, if any shadow of doubt existed as to its previous powers.
The act of 1867, limiting the right to equitable relief by way of injunction against the West Side and Yonkers Patent Railway Company, and interdicting this and other courts from exercising the power of a court of equity, from granting such relief in a case properly presented and. which it might entertain against a natural person, was a clear and manifest invasion of the con* *488 stitution, and of this express mandate that the corporation should be liable “to be sued, in all courts, in like cases as natural persons.” To hold otherwise would seem to be a perversion of the plain language of that instrument. The constitution of 1870, having confirmed this court in the powers and jurisdiction it then possessed, and in such others as should thereafter be conferred upon it by law, it cannot well be imagined or successfully maintained, that it does not now possess equal powers and jurisdiction (within its territorial limits) with those of the supreme court, in all civil actions and special proceedings.
In the defense of the somewhat celebrated Forrest divorce suit, “ quorum pars minima fui,” I ventured to suggest to my distinguished colleagues, an analogous objection to the jurisdiction of the superior court, in which it was pending, predicated upon these propositions—the jurisdiction over matters of divorce originally existed in the ecclesiastical courts ; in this State it was first conferred upon the chancellor, and was exclusively exercised by the court of chancery. On the adoption of the constitution of 1846 abolishing that court, all the powers exercised by the court of chancery were transferred to the supreme court, and such transfer of the special jurisdiction of the chancellor in matters of divorce not being alluded to, was not conferred upon the superior court by section 33 of the Code of 1848, giving jurisdiction to that court of “ all actions where all the defendants reside or are personally served with the summons” within this city. This point was ably presented on argument, by those counsel, but met with the like disastrous fate of all other efforts on our client’s behalf, in the final and decisive opinion of the court of appeals, reported in 25 JY. Y. 501. The claim to a want of jurisdiction in the act of 1867, chap. 489, section 11, that all applications for injunction in any matter relating to the railway authorized by that *489 act, must be overruled; first as unconstitutional; second, as inapplicable to the present railway on the east side of the city, as that referred to in the act was one on the west side and on a different route ; and third, if originally of any avail, any special jurisdiction was by the act of 1873, under article 6 of the constitutional amendment of 1870, expressly conferred on this court in cases (like the present) coming within its local jurisdiction, and by the appearance of the corporation whose business is within this city.
Recurring to the claim made by the plaintiff to ■ownership in fee in the street in front of his premises, the following facts appear : The streets and highways within the city limits, that had been opened previous to 1664 while the Dutch government had jurisdiction of the territory of the city, were vice publica}, and belonged absolutely to the sovereign power, and the adjacent owner had no right to the soil or bed of the road either during its use or upon its discontinuance. Upon the accession of the British government, it succeeded to such royalties as had previously been held and possessed by the Dutch government in and to such streets and highways as had been laid out and established, and these comprised almost, if not all, the streets of the city, below Wall street now existing, which were then above low water mark. The Dongan charter of 1686, section 2, granted to the city corporation “all the streets, lanes, highways, and alleys in the city, as well for its public use and service, and of the inhabitants of Manhattan Island aforesaid and travellers there.” Authority was thereby also given to the corporation (§ 2, Kent's Charter, p. 15) “to establish, appoint, order and direct the establishing, making, laying out, ordering, amending, and repairing of all streets, lanes, alleys, highways, water courses, ferries and bridges, in and throughout the said city of New York and Manhattan’s Island aforesaid, necessary, *490 needful and convenient for the inhabitants of said city and Manhattan’s Island aforesaid and for all travellers and passengers there, provided always that this license so as above granted for the establishing, making, laying out of streets, &c., should not be extended or be construed to extend to the taking away of any person or persons’ rights of property without his, her, or their consent, or by some known law of the said province.”
The colonial act of October 9, 1691, by section 1 authorized the corporation to appoint surveyors of streets, &c., to see the same were laid out with uniformity, according to such rules and orders of -building and laying out the same, as should be established by the corporation, who were thereby authorized to make such rules and orders for such streets as should be found convenient for the inhabitants; by section 2 it was provided, that if in the laying out of any future street, &c., “they do take any person’s grounds,” they should “givenotice to the owners and parties interested in the ground so to be taken for the intent aforesaid, and to the intent that reasonable satisfaction may be given for the ground as shall be taken and employed for the use aforesaid . . - . the mayor, aldermen, and common council shall and may treat and agree with the owners and others interested therein.” And if no agreement was made they were to summon a jury before the mayor’s court to inquire and assess such' damages and recompense as they should see fit to be awarded to the owners and others interested, according to their several and respective interests and estates in any such ground or part thereof for their respective rights and interests in the same as by the said mayor, aldermen and commonalty should be adjudged to be converted to the purposes aforesaid, and upon such verdict and judgment of the court, and payment or tender of the amount of such assessed value “ the judgment was to be binding” upon and *491 against the parties, their heirs, executors, and assigns and others claiming any title to the said ground, and shall be full authority to the mayor, aldermen, and common council to cause the said ground to be converted and used for the purposes aforesaid.
The provisions of this act were substantially reenacted in sections 1 and 2 of “an act to regulate the buildings, streets, wharves and steps in the city of New York,” passed April 16, 1787 (1 Greenl. Laws, 441). It recognized the, existing power of the corporation to establish, make and lay out new streets, but regulated the mode of exercising it, in invitum, as contemplated by the Dongan charter in the provision that such license should not be construed to extend to the taking away of any person’s right or property with out consent, or “ by some known law of the said province.” In my opinion in Patten v. N. Y. Elevated R. R. Co.,* I am conscious of some inaccuracy in regarding the act of 1691, rather as the original authority by which streets might be established, laid out and made, or otherwise than as such supplemental colonial legislation as was necessary to carry into effect the public powers in this respect that had been conferred upon the corporation by the Dongan charter and which continued in full force and effect until after the revolution, and became superseded in this respect by the act of April 3, 1807, (chap. 115, section 9).
By the subsequent Montgomery charter of 1730, which'confirmed the previous Dongan and Cornburj charters (sec. 37) by sec.-16, general power, license and authority was also conferred upon the corporation to establish or appoint, order and direct the making and laying out of streets in and throughout the city in such manner as the common council for the time being, or a major part of them, should think or judge to be neces *492 sary and convenient for all inhabitants and travellers there.
This charter also granted to the corporation lands in the waters of the East and Hudson rivers, extending outward four hundred feet from low water mark, which space, as appears from the testimony, includes the premises owned by the plaintiff, and also the portion of Front street in front thereof, which he also claims to own in fee.
These several charters of the city, including that known as the Cornbury charter, were, by an act of the colonial general assembly passed October 14, 1732, entitled “ an act for confirming unto the city of New York its rights and privileges” (1 Gainers Laws, N. Y. 169, chapter DLXXXIV, 584), declared “ good, valid, perfect, authentic and effectual in the law,” and were ratified and confirmed, and the act itself was declared a public act. Their validity has scarcely ever been since seriously questioned.
The premises, plaintiff’s ownership of which is undisputed, are known as Nos. 7 and 9 Front street in this city, and were conveyed to him by the deed under which he holds his title, made by Abraham B. Conger, and Mary Rutgers M’ Crea, his wife, dated December 18, 1849, by the following description :
“All that certain lot of land situate, lying and being in the first ward of the city of New York, aforesaid, on the southeasterly corner of Moore and Front streets, bounded northerly in front by Front street, aforesaid, •easterly by ground conveyed by John S. Conger, and Sarah, his wife, to Elias H. Herrick, by deed bearing date the 1st day of May, 1839,- southerly by ground now or late of the said Elias H. Herrick, and westerly by Moore street, aforesaid, containing in breadth on Front street thirty feet ten inches, and in the rear thirty-eight feet ten inches, and in length on each side eighty feet, be the same more or less.”
*493 The title to such land as the plaintiff owns under that conveyance, is derived through two grants made by the corporation of premises that lay adjoining; one being made to Isaac De Peyster, dated December 2, 1773, and the other to Thomas Ellison, Jr., dated December 26, 1773, which each described the premises granted as that certain ground and water lot, situate in the south ward of said city, opposite a certain dwelling house fronting the street, commonly called the Dock street (wharf) lying between said dwelling house and the water lot thereby granted, to extend southerly so far into the East river or harbor as the new pier of William Milliner did extend; and each stated the premises granted to be in breadth on Dock street aforesaid (now Water) also in breadth on the north side of Water street (now Front) in precise measurements, and on the south side of Water street (now Front) in other precise distances, as to which it was stated the premises intended to be conveyed more fully might appear by a survey of Gerard Bancker, a city surveyor, dated November 10, 1772, and filed in the office of the town clerk, reference being had thereto ; and each grant contained on the part of the several grantees their respective covenants, among others, that they would erect and make a good and sufficient firm wharf or street of forty-five feet, English measure, in breadth at the distance of 139 feet eight inches from the aforesaid street called Dock (now Water) street, which (now Front street) was to range with the present street, to the "eastward thereof, adjoining a basin there lately made, called Water (now Front) street,” which said street shall also be built, erected and made in such manner upon a straight or right line, as one of the "surveyors of the said city shall instruct and directand also another exterior street (now South) of forty feet in breadth on the outer part of such water lot, next to the East river, all of which streets were to be so built, *494 erected and made on - straight lines, as the surveyors of the city should direct, and were all to be completely made and finished by such covenantors, on or before May 20, 1778, and (as was further covenanted) said several streets “shall forever thereafter continue and be for the free and common passage of and as public streets and ways for the inhabitants of the said city and all others passing and returning through and by the same, in the same manner as other streets of the same city now are and lawfully ought to be.”
The claim made by the plaintiff to own the fee, or any interest in the land in Front street in front of his premises to the center of the street, under these public acts and grants, presents various considerations.
First: It appears from the several grants of the corporation to De Peyster and Ellison, that Front (then styled Water) street, had been within the language of the Dongan charter “ established, appointed, ordered and directed” so far that it had been surveyed and plotted out by Gerard Bancker, a city surveyor, on a map dated November 10, 1772, and filed in the office of the town clerk, which was referred to • in the deeds, and adopted as part thereof. This map (now lost), as the grants disclose, gave the precise location of Front (then Water) street, and the precise dimensions thereon of the premises granted _ on the north and south sides thereof, and recognized Water (now Front) as an existing street.
The act of 1691 had reference to the involuntary taking by the lands of other persons for the purposes of streets, and had no application to such as the corporation had already “ established, appointed and directed ” to be made or laid out in and through premises which they owned in fee. While the charters above mentioned conferred upon and granted to the corporation private and absolute rights of property in markets, docks, lands and ferries, and also in other franchises *495 given and allowed to be exercised for corporate purposes, but in trust for their constituents, they also invested them with many other powers intended to be exercised c ‘ in jure publici ’5 for the general public good (Bailey v. The Mayor, &c., 3 Hill, 531; Benson v. The Same, 10 Barb. 223). The latter power constituted a delegation of part of the political or governmental powers of the sovereign, or sovereign power, which might at any time be modified or revoked by the legislative or sovereign power. In the exercise of such public functions in the laying out and establishing of streets, the corporation were but the representatives of such sovereign power, and they, in its exercise, dominated and controlled their own private rights, as well as those of private persons. In the conveyance of their own private lands, over and upon which they had established or appointed streets upon such common and general plan as that indicated by their grants to Be Peygter and Ellison as laid out on the Bancker map, and in treating and dealing with such streets as they had under such public powers so laid out, established or appointed, as indicated by their grants, the same rule of construction is applicable thereto, as would appertain in construing any other public grant; to wit, that it must be held more strictly against the grantee, so that no title should pass in or to a public street or highway, "although the language used would convey it as between private individuals.
This rule of construction is founded upon considerations of public policy, in order to preserve in the public, undiminished, the right of absolute control over the public property and its right of use of the streets and highways. When the public function was thus exercised by the corporation, in laying out and establishing streets and highways over any property they held for mere municipal purposes, the character of their tenure therein became changed, and their title by such public *496 dedication became one held in trust for the specific purpose of general public use, and, in my view, to the same intent and purpose as they held title in the other' streets and "highways of the city, and subject to like-legislative interference and governmental control. The question whether they have some interest in the possibility of reverter, or their estate therein, is, or may be,, one simply subject to-the principles and rules of ordinary dedication, does not, however, arise in this case,, and will become the subject for decision when a conflict of such possible antagonistic interests is presented for adjudication.
But a reference to these grants scarcely needs any appeal to this principle of construction. The character of the tenure of the corporation in the existing streets of the city derived through the Dongan and Montgomery charters, as grantees of the absolute title previously held by the Dutch, and as subsequently derived from the crown, or as affected through means of the act of 1691, was recognized by De Peyster and Ellison in the grants made to them; and they, and not the corporation, covenanted that said streets mentioned in the grants (now Water and South), should forever thereafter continue as public streets and ways for the inhabitants of the said city, &c., ‘ ‘ in the same manner as the other streets of the same city now are or lawfully ought to be.” As to all such other streets (so far as it is made to appear), they were without exception held by the corporation absolutely in fee, in trust for- the general public use and were not limited in such use to a mere public easement, but might be appropriated to all and every such public use and purposes as the legislature or sovereign power might lawfully prescribe.
But if the opening of Front street in front of these lots, If os. 7 and 9, was in any respect in derogation of any right of property of De Peyster and Ellison, secured by their grants, it is to be presumed (the contrary not *497 being shown) that it was so done in accordance with their covenants, and on execution thereof, so that the street became by its execution one held, in the language of the covenants, in the same manner “ as other streets of. the same city now are, or lawfully ought to be.” The law would infer from this long-continued use of the street by the corporation for many years past, a complete execution of this covenant, and that done, which in equity ought to have been done.
' Plaintiff’s counsel also claim that a true construction of the act of 1691, at most authorized the taking of a mere easement as distinguished from the absolute “taking of the ground,” and payment of its value as indicated by the language used in the act of 1691; and rely upon the case of the Washington Cemetery v. The Prospect Park and Coney Island R. R. Co., recently decided by the court of appeals, but not yet reported.* It is true that case is dependent upon the use of somewhat analogous language used in the acts adjudicated upon (chapter 531 of the laws of 1873 and chapter 307 of 1874), authorizing the taking of lands for the purposes of an avenue laid out through lands of plaintiffs, which, in that case and to that end, authorized the commissioners appointed under the act “ to estimate the value of the lands and premises required” to be taken for said avenue; and the damages to be sustained by “any person interested therein by reason of such taking.” The court held that but an easement for a public street was' taken. It will be perceived, on comparison, that these terms and those of the act of 1691 differ materially. The latter required satisfaction to be made for the ground taken and employed, and payment to be made to the owners for their respective interest in the same. The act referred to in the case in the court of appeals contained no such requirement to make com» *498 pensation for the right and interest of the owners “ in the ground,” but evidently had mere reference to the damages sustained by the owner from the opening of the road. The subsequent legislation, of the State somewhat exemplifies at least the legislative construction of the colonial law. In the street-opening act of 1787 (chap. 88) and 1801, (chap. 129, Davies' Laws N. Y. pp. 385 to 403), satisfaction was to be made for the ground taken for the' purposes of the street, and in cases of disagreement with the owners, a jury was to be called to assess the damages and recompense due to the owners for their losses. These acts, under ordinary circumstances, would justify a like construction with that given by the court of. appeals in the unreported case above referred to. In the subsequent act of 1807, chap. 115 (Sess. Laws, p. 125) relating to streets and avenues in the then upper part of the city, now designated by alphabetical letters and numerals, the incongruity likely to result in the character of the tenure of the corporation in the streets, without more emphatic legislation, was expressed in section 10, whereby it was declared that on the completion of the assessment for opening of any streets under its provisions the corporation should be and become seized thereof in fee. A like enactment is contained in the street-opening act of 1813, chap. 86 (2 R. L. 409, sec. 177), extending the same provision to all cases of street openings, and in like terms assured and vested the fee of the land in the corporation (sec. 178, p. 414). Judge Hoffman, in his treatise upon the rights of the corporation in the streets of the city, expresses the unqualified opinion, that as to all streets opened while the act of 1691 remained in force, the whole estate, right and title of every person claiming the land taken was appraised and paid for (vol. 1, p. 317). The commonly received opinion among judges and lawyers, has been that in all cases of lands taken and condemned under *499 any of these acts, the corporation acquired an absolute fee in the soil, and, unless some well established rule of law is infringed upon (Drake v. Hudson R. R. Co., 7 Barb. 536), the incongruities that would necessarily arise from a different construction and in holding the title of the corporation so acquired under these laws, different, in different streets of the city and perhaps in the same street, would create an embarrassment, which, so far as I am aware, has never been recognized to exist. I am of the opinion, therefore, that the act of 1691 must be construed with reference to the then existing title of the corporation in the other streets of the city to which as successors in interest of the Dutch government they had acquired titles, as owners in fee, and with a full recognition by the colonial assembly of the general ■character of such title. Ho case is presented in which any doubt was ever raised, as to the absolute title to any lands which, during that period, the corporation had entered upon or condemned as streets during the colonial existence of the city.
Claim is also made by the plaintiff that some rights appertain to the premises included within the recognized grants to De Peyster and Ellison, and which attach to the premises owned by him, growing out of the covenants contained in those grants, that said several streets should forever thereafter continue and be for the free and common passage as public streets. It is, however, to be observed that such covenant is that of the grantees and not of the grantors ; and, for the reasons before stated, to hold that it was impliedly that of both parties would be contrary to the principle of construction before mentioned. It would not be binding upon the sovereign power which the corporation represented in the laying out and establishing streets, and even if held the private covenant of the corporation, the matter of the covenant was still the subject of legislative control for all public purposes, although *500 entered into under some assumed authority to bind the-public, while acting in its behalf. It yet could neither-limit the public right, nor could the corporation beheld liable in their private municipal character for acts done under such powers as they exercised in pursuance-of their public trusts, or for any breach of any covenant they had entered into relating to such public acts; (The Brick Presbyterian Ch. v. The Mayor, &c., 5 Cow.. 538).
The covenant in question is in no respect one which by its own force or effect imposed any such charge or incumbrance upon the public street, as could interfere-with the powers of the legislature to devote the street to any such public use as they saw fit.
Upon each and every of these considerations the-plaintiff fails to establish any interest in the fee in. that part of Front street opposite his property. First, by reason of the relative character of the parties in the-grants to De Peyster and Ellison when dealing in respect to premises across which the Front street—as-would appear from the survey of Gerard Bancker, city surveyor—had already been established and laid out in continuation of the same prior-existing street to the eastward thereof “called Water (now Front) street.” Secondly, by reason of the grantee’s covenant to build,, erect and make before May 26, 1778, a street forever to continue and be a public street “in such manner as the other streets of the same city now are and. lawfully ought to be.” Thirdly, from the general character of the tenure of the corporation in the. streets, of the city being in absolute fee, as before mentioned, whether predicated upon the apparent intent of the conveyances to assimilate the title of the corporation-in this portion of Front street to that generally held by them in the streets of the city, which so far as appears, was “ an absolute fee in trust for the public-;” or if taken under the act of 1691—as might possibly be *501 •assumed—that it was opened and the land acquired by •authority of law, that it had been so opened and compensation made, if not consented to, in the manner the existing statute authorized and required (Colden v. Thurbur, 2 John. R. 424; William v. Cummington, 18 .Pick. 313). Further question might be made to plaintiff’s title in the street in deraigning it from De Peyster •and Ellison under the recent authorities of English v. Brennan, 60 N. Y. 609, and White’s Bank v. Nichols, 64 Id. 65, in the inquiry whether for disturbance and ■eviction from Front street—except by force of the public easement, through superior title, he could maintain any action upon any warranty of title contained in •any of the deeds through which he held, or whether the intention of those conveyances was not fully satisfied by limiting his rights to the sides of the street. But it is not necessary further to pursue this subject.
Plaintiff also claims that although it should be determined that he is not the owner in fee or of any private interest in Front street, otherwise than as an abutting ■owner, with right of easement therein, in that relation he is thereby entitled not only to recover damages for •any interference with such right, but also to an injunction until he has first obtained complete compensation for such injury as his property shall prospectively sustain thereby, from a deprivation of an easement in the street to such extent as it shall be invaded by the railway contemplated by the defendants, and this he asserts under the provision of the constitution that private property shall not be taken for public purposes without just compensation.
Under such asserted rights the first question presented is whether as such abutting owner on Front street, without showing any other title therein, he is •entitled to any compensation for any other authorized public use of the street, “ usque ad ccelum,” than for the purposes of a public highway, since it clearly ap *502 pears that this contemplated elevated railway in noway interferes with such public use of the street except to such extent as the columns upon which it is erected, each being about fifteen inches square, and placed at intervals of about forty feet apart, but none directly in front of plaintiff’s premises, incommode and interfere with the rights of the public in passing along this street. If the construction of this elevated railroad be authorized by law, it is in no respect a public or private nuisance. The constitutionality of the general rapid transit act of June 18, 1875, chap. 606, has been sustained by the court of appeals, and no objection is suggested as to the regularity of any of the proceedings of the defendants to effectuate their rights tO' construct and operate said railway, except that it is claimed that in the absence of any consent of the owners of half in value of the property of the portion of the street upon which it is proposed to construct and operate said railway, they have not first obtained the consent of the local authorities having the control of such streets or portions thereof, to wit: of the corporation of this city {Laws of 1875, c. 606, sec. 4).
The proof adduced justifies the finding that such consent was obtained in a resolution of the common council of this city, approved by the mayor (N. Y. & Harlem R. R. to Forty-second street and H. R., 50 Barb. 312).
The corporation makes no complaint, and the plaintiff is in no respect a champion of their rights, and that, consent may be manifested by some corporate act or by their acquiescence.
The right "of the defendants to proceed in the prosecution of their work seems perfect, unless in doing so, they are taking some proprietary right of the plaintiff, in an easement in Front street, of which he shall thereby be to some extent deprived by their contemplated acts. It would seem, that some question is con *503 ceived to have been raised upon this point in the rapid transit cases by the memorandum opinion of Judge Allen in the court of appeals, and the grounds assigned by some of the judges dissenting from the decision of the majority, and placing such dissent upon the ground that no provision was made, in the act of June 18, 1875, for compensating the abutting owners.* Having previously held that the plaintiff had no right as owner of the fee in Front street, it becomes necessary to examine into the character of tenure he may have to any right of easement therein from being an abutting owner. Recurring to the decisions of our own courts, it would seem the question was first substantially presented in Lansing v. Smith, 4 Wend. 9; • wherein the plaintiff had, though a grant from the commissioners of the land office, become, owner of a water lot fronting on the Hudson river at Albany, under the general act of the legislature (1 It. 8. 293), authorizing such grant for the promotion of commerce, on which a dock or wharf had been constructed freely accessible by vessels navigating the river.† Subsequently, by act of the legislature, the construction of the Albany pier outside of plaintiff’s dock was authorized by law, in the building, location and use of which, in front of plaintiff’s dock, its usefulness and value from customary wharfage were seriously interfered with, injured, and his right destroyed, and it was insisted he could not be deprived of such private right to use his dock and to acquire the legitimate wharfage that was incident thereto, without just compensation, and that the legislature had no right to authorize the erection of the pier, without making provisions for all such injuries to private right. The court held the right to navigate the public waters of the State and the right to use the public highway, were all public *504 rights belonging to the public at large ; that they were not the private unalienable right of each individual; hence the legislature, as the representatives of the public, might restrict and regulate the exercise of those rights in such manner as might be deemed most beneficial to the public at large, provided they did not interfere with vested rights that had been granted to individuals ; that although the plaintiff’s business was materially changed and affected by the legislative act under which the pier was constructed, his private property was not taken, and there was no violation of the contract on the part of the State, granting his predecessors in the title, the water-lot for general purposes of commerce. In Graves v. Otis, 2 Hill, 466, the defendants, trustees of the village of Watertown, under authority of law, cut down the sidewalk in front of plaintiff’s store, which was within ground dedicated to the public as a public square and highway, so as to leave the store some six or eight feet above the sidewalk, and caused the injury to the plaintiffs complained of. It was held that for such injury the plaintiffs were remediless.
In Benedict v. Goit, 3 Barb. 459, it was held that any inconvenience or damage any person might suffer by the proper and reasonable repairs of a public highway by the public authorities in the legitimate exercise of their powers was 1 ‘ damnum absque injuria ” and no action lies therefor. The premises injured in this case adjoined the public highway so attempted to be improved, and similar objections to the legality of the act as are now presented, were urged by the plaintiff’s counsel (p. 463) and overruled.
In the First Baptist Church v. The Utica and Schenectady R. R. Co., 6 Barb. 313, the plaintiffs owned a church in the use of which for purposes of religious worship, they were disturbed by the use of defendants’ railroad running near and contiguous thereto. Held, *505 the defendants’ acts being justified by their charter, no .action could be maintained, except for such as were unnecessary, wanton or malicious.
In Dougherty v. Bunting, 1 Sandf. 1, the defendant obstructed the public street in front of plaintiff’s premises by piling wood therein, but otherwise occasioning no special damage, except an estimated damage, by reason of the nuisance,—speculative damages from the interference with rents and customs, which plaintiff might have otherwise realized or received;—and it was held the action could not b.e maintained.
In Drake v. The Hudson River R. R., 7 Barb. 508, where the plaintiffs owned property fronting on Hudson and other streets in this city, in and through which the •defendant’s railroad had been laid out, and an injunction was sought to prevent their laying down their track of rail, it was held, plaintiffs not owning the fee in the streets on which their premises fronted, that no interest in those streets was taken by the acts of the defendants extending their tracks through said streets, notwithstanding they had a right of way therein, and the streets were necessary for the use and accommodation in the enjoyment of their premises as appropriate and applicable to the purposes of residence and business operations: that in that relation, while having rights and interests in the public use of the streets for legitimate use as such, yet they had no special' private or exclusive right to or property in the use or enjoyment of them, which, under the constitution, was taken, and for which compensation had to be made before the rights and privileges conferred therein on the defendants could be enjoyed by them.
In Radcliff v. The Mayor, &c. of Brooklyn, 4 N. Y. 195, the plaintiff brought action for injury to his adjoining premises, from the acts of the defendant in grading and levelling a street as they were authorized to do by law, in wrongfully' failing to uphold his ad *506 joining premises which lay above the grade oí the street, whereby a portion of them fell. In this case the court of appeals held that although such falling of-the earth and injury to plaintiff’s premises may have occurred, it was in consequence of lawful acts on the part of the defendant; that the injury having been thereby inflicted, in the due and proper exercise of the powers conferred by law, it was not a taking of the plaintiff’s property within the meaning of the constitution. They say (page 205) “but laws which authorize the opening and improving of streets and by-ways or the construction of other works of a public nature, have never been held void because they omitted to provide compensation for those who, though their property was not taken, suffered indirect or consequential damages. The loss which they sustained has always been regarded as “ damnum absque injuriad
In Gould v. The Hudson R. R. Co., 6 N. Y. 522, plaintiff was owner of a farm bounded on the Hudson river, and by the construction of the defendant’s railroad below high water mark and in front thereof, was prevented and obstructed in the passage of vessels between his farm" and the channel of the river. Held : He had no private right in the waters of the river, or in the shore between high and low water mark, and was not entitled to compensation because of being prevented from having customary access to the river and being cut off from all communication between his land and the river otherwise than across the railroad.
The question whether the exercise of such a right was in any respect the taking of property without com-' pensation to abutting owners for consequential damages was elaborately discussed and passed upon in the supreme court, in The People v. Kerr, 37 Barb. 357, and that court decided, as afterwards in the same case did the court of appeals, 27 N. Y. 193, affirming the right as now claimed by the defendants. In *507 the opinion announced in the latter, court Judge Emott says, “ even though the construction and use of an iron track for vehicles in the streets of the city of New York should be an interference with and injury to the use and enjoyment of the lots fronting on such streets to such an extent that it would be a continuous private nuisance, if it were not authorized by law, yet the statute granting such authority is not unconstitutional or invalid because it does not require compensation for the injury to the owners of such property. Private rights and interests must and do give way in numerous instances to the demands of the public good. The books are full of cases, and the principle is perfectly well settled that for any incidental injury or consequential interference with the use and enjoyment of private property resulting from the lawful acts of the public or its agents, no action will lie unless there has been negligence or willful misconduct to cause or contribute to the injury.” In the opinion of Weight, J., in the same case (p 210), in which all the other judges of the court concurred, he held that the streets having been opened under the act of 1813, and a title in fee in trust for the public use thereby acquired, the other plaintiffs in the action, “abutting owners,” had “no property estate or interest in the land forming the bed of the streets in front of their respective premises to be protected by the constitutional limitation upon the right of eminent domain.”
In Coster v. The Mayor of Albany, 43 N. Y. 414, the same court say, “ And if, in the exercise of this right (of the legislature), a street be discontinued and the value of the land abutting on other parts of this street and on neighboring streets be lessened, it is not such an injury to the owner as to entitle him to damages.”
In Kellinger v. The Forty-second Street R. R., 50 N. Y. 206, the court, by Church, Ch. J., say as to the *508 case of The People v. Kerr, supra, “ we should feel bound to adhere to .this decision and its necessary legal results, even if we doubted its soundness..... It clearly holds that the abutting owners had no property in the street which was taken for the railroad, for which they were entitled to compensation..... The abutting owners have an easement in the street in common with the whole people to pass and repass and also to have free access to their premises, but the mere inconvenience of such access occasioned by the lawful use of the street is not the subject of an action.”
In the several cases in the court of appeals in which the Gilbert Elevated Railway Company were plaintiffs, not yet reported,* Chief Justice Church, in an opinion in which all the judges concur, says, “To determine what particular occupation of the streets is to be determined a public use involves important and delicate questions. They were much debated in this court in the surface railroad cases, and the principles adjudicated in those cases will be regarded as obligatory upon the court in deciding future cases. Whether the structures contemplated to be built and operated will be an invasion on the property of abutting owners in any of the streets entitling them to some remedy for damages or whether it will be regarded as a legitimate use of the streets for the benefit of the public, the inconvenience and annoyance of which private abutting ownership is subject to, cannot with propriety be adjudicated upon these appeals.” ■
Judge Earl, in the majority opinion in the case of the petition of the N. Y. Elevated Railroad Company,† held the general rapid transit act furnished ample provision for compensation for any property rights the abutting owners might have in the streets. Whatever informal *509 remarks are attributed to Judge Allen, in the decision of these cases,* they must be-held as applicable to any proprietary right of the abutting owner in the street.
A reference to the above authoritative decisions in the courts of our own State and in construction of its constitutional provision would seem to conclusively debar the plaintiff from any such right as that he claims, to enjoin the defendants from constructing and operating their railway in Front street in front of Ms premises without prepayment of such damages as may ensue to him therefrom, or any claim to damages whatever by reason of any annoyance, inconveMence, or detriment occasioned to his premises arising from the construction and legitimate use by the defendants of the street in front of his premises as authorized under said act of June 18, 1875.
For these reasons the defendants are entitled to judgment in their favor, dismissing the complaint upon the merits with costs.

 Reported in 4 Mb. New. Caí,

 See pp. 432, 433 of this vol.

 Compare People v. Colgate, 67 N. Y. 512.

 Reported at pp. 434, 448 of this vol.

 Reported at p. 401 of this vol.

 See p. 438.