ACME REALTY CO. v. SCHINASI.

(Supreme Court, Appellate Division, First Department. January 3, 1913.)

1. VENDOR AND PURCHASER (§ 130*)—ENCROACHMENTS ON STREET—MARKETABLE TITLE.

Show windows and a platform and steps giving access to a building, all of which may be easily removed, which extend some distance into the street, are not such encroachments thereon as to render the title unmarketable.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 245, 246; Dec. Dig. § 130.*]

2. MUNICIPAL CORPORATIONS (§ 671*)—BUILDING CODES—STATE LAWS.

New York City Charter (Laws 1901, c. 466) § 407, providing that the Building Code of New York City as existing on January 1, 1902, would be binding as to the alteration, construction, removal of buildings, etc., and section 5 providing that such act should not affect or impair any act done or right accruing prior to the going into effect of the act, did not affect the legality of provisions of the Building Code prior to January 1, 1902, and did not prevent the city from removing encroachments on the streets prior to the act taking effect, if it had such power, on account of the Building Code being contrary to state laws.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1447–1450; Dec. Dig. § 671.*]

3. VENDOR AND PURCHASER (§ 130*)—PROJECTIONS INTO STREET—MARKETABILITY.

The construction of a building with bay windows, consisting of masonry, and extending from the ground in several places, and several other places starting at the second floor and running to the top of the building, and projecting a foot into the street, renders the building in the city of New York unmarketable, and subject to rejection by a prospective buyer.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 245, 246; Dec. Dig. § 130.*]

4. MUNICIPAL CORPORATIONS (§§ 680, 681*)—OFFICERS—STREETS—ENCROACHMENTS.

No local authority whatsoever can authorize any private individual to encroach on a public street.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1459–1466; Dec. Dig. §§ 680, 681.*]

Scott, J., dissenting.

Appeal from Judgment on Report of Referee.

Action by the Acme Realty Company against Solomon Schinasi. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

Argued before INGRAHAM, P. J., and McLAUGHLIN, CLARKE, SCOTT, and DOWLING, JJ.

Alfred F. Seligsberg, of New York City (Edmond E. Wise, of New York City, of counsel, and Harold Swain and Otto Horwitz, both of New York City, on the brief), for appellant.

Philip S. Dean, of New York City (David B. Ogden, of New York City, of counsel), for respondent.

CLARKE, J. This action was brought to compel the specific performance by the defendant of a contract for the purchase of the

premises known as 375 Manhattan avenue and Nos. 354–356 West 116th street, in the borough of Manhattan, city of New York. The agreement was entered into May 7, 1906. The purchase price was $107,500, and a full covenant warranty deed conveying the premises free from all incumbrances except a mortgage and lease was to be delivered on the 29th day of May, 1906. Various adjournments were had until June 6, 1906, when the purchaser refused to accept the title on the ground that the same was unmarketable by reason of encroachments on both 116th street and on Manhattan avenue. These encroachments consist of two show windows below the second story on the 116th street side, extending beyond the street line one foot, and, beginning with the second story, two bay windows, called oriel windows, are corbelled out from the main wall, and extend to the top of the building. They are constructed of mansonry, and extend one foot beyond the street line. Similarly two bay windows on the Manhattan avenue side, one of which begins in the basement, is of masonry construction, and extends to the top of this seven-story building, projecting one foot throughout. Excepting at the first story, where there are recessed stone slabs, there are two windows at each story of the bay. The other bay window is directly over the portico. About 20 feet from the southerly line of the lot this other bay window is corbelled out from the wall at the third story, and extends to the top of the building, projecting uniformly one foot. Beneath this bay window are the stoop and portico and main entrance of the building. The portico is of limestone construction, rises two stories above the street, and projects one foot. Above the top of the second story there is a stone balcony projecting an equal distance. The stoop connected with the portico extends four feet beyond the building line, and is fourteen feet long. This action was begun on July 25, 1906. The answer alleges the above-mentioned encroachments, and demands, by way of counterclaim, the return of the $5,000 paid at the time of the signing of the contract and $266.87, cost of searching of the title and survey. The case was duly referred, and upon the referee's report judgment in favor of the plaintiff for specific performance was entered, from which judgment defendant appeals.

There is no dispute about the encroachments, their extent, character, or construction. There is a conflict as to whether the defendant had actual or constructive notice of the existence of the encroachments, and there is a sharp conflict as to the cost of removal and subsequent damage to the rental value of the building, which, however, the referee resolved in favor of the plaintiff, holding that the cost of the removal of the projections and the restoration of the building to a condition in which there would be no encroachments would not exceed $2,000, and that there would result no substantial rental loss or impairment of the fee value. The defendant claimed that the cost of removal would be upwards of $5,000, that there would be a substantial loss of rental during the period of reconstruction, and a further permanent impairment of rental value in apartments where the bay windows were removed, and a consequent impairment of the fee value of the premises to the amount of $5,000.

[1] I do not regard the show windows and the platform and steps giving access to the building under the front porch such encroachments as to render the title unmarketable. They may be easily removed or restricted within proper limits without seriously affecting the building. But the permanent so-called bay windows and projections running up from the foundations of the building, and forming an integral part of the street front thereof, and concededly projecting one foot beyond the building or street line, present a serious question. The argument of counsel for the respondent, in so far as it is based upon the proposition that the encroachments complained of were authorized is based upon the following findings of the learned referee:

"Seventh. The building erected upon the said premises is an apartment house, seven stories in height, which was begun and finished in the year 1901. * * *

"Eighth. Said building was erected pursuant to and under a permit of the building department of the city of New York after plans had been duly filed and approved for the construction thereof, and the said building was completed in November or December in the year 1901, in conformity with said plans.

"Ninth. The said plans fully disclosed that it was proposed to erect the said building with portions thereof encroaching over and upon the said avenue and street, as shown in said survey."

The argument upon the law is that in 1901, when said building was completed, an encroachment beyond the building line of bay or oriel windows to the extent of one foot was permitted by law. For that counsel relies upon the following matters: That section 647 of the Greater New York Charter of 1897 (chapter 378 of the laws of that year) provided that:

"The municipal assembly shall have power to establish and from time to time to amend a code of ordinances, to be known as the 'Building Code,' providing for all matters concerning, affecting, or relating to the construction, alteration, or removal of buildings or structures erected or to be erected in the city of New York, as constituted by this act, and for the purpose of preparing such code to appoint and employ a commission of experts. * * * The provisions of such 'Building Code' shall be in conformity with and be subject to all general laws of the state concerning, affecting, or relating to buildings, or classes of buildings, or other structures."

That in conformity with the provisions of said section a Building Code was adopted by the municipal assembly and approved by the mayor on October 24, 1899. That by section 73 of said Code it was provided:

"Bay windows, oriel windows and show windows, on the street front or side of any building may project not more than one foot beyond the building line and shall be constructed of such material and in such manner as will meet with the approval of the department of buildings."

But at the very time that said Code was adopted, section 49 of the charter, conferring power upon the municipal assembly to make ordinances "not inconsistent with this act, or with the Constitution or the laws of the United States, or of this state," provided in subdivision 3 thereof for the passage of such ordinances "to regulate the use of streets, highways, roads, public places and sidewalks by foot passengers, animals, vehicles, cars, motors and locomotives, and to

prevent encroachments upon and obstructions to the same, and to authorize and require their removal·by the proper department; but they shall have no power to authorize the placing or continuing of any encroachment or obstruction upon any street or sidewalk, except the temporary occupation thereof, during the erection or repairing of a building on a lot opposite the same. * * *" So that if the Building Code was, as it clearly was, an ordinance of the municipal assembly, and if it authorized a permanent encroachment upon the street, of which character the structures at bar clearly were, then said ordinance was in direct conflict with the law of the state which expressly provided that the municipal assembly should have no power to authorize the placing or continuing of any encroachment or obstruction upon any street or sidewalk, except the temporary occupation thereof during the erection or repairing of a building on a lot opposite the same.

[2] But the learned counsel argues that by the revised charter (chapter 466 of the Laws of 1901) it was provided in section 407 thereof that:

"The Building Code which shall be in force in the city of New York on the first day of January, nineteen hundred and two, and all then existing provisions of law fixing the penalties for violation of said Code, and all then existing laws affecting or relating to the construction, alteration or removal of buildings or other structures within the city of New York are hereby declared to be binding and in force in the city of New York, and shall continue to be so binding and in force except as the same may from time to time be revised, altered, amended or repealed as herein provided."

This he̅claims transforms the Building Code from a mere municipal ordinance to an act of the Legislature, and that whatever provisions said Code contained were as if they had been specifically̅enacted by the Legislature. The answer seems obvious that by section 5 it was provided that this act shall take effect on the 1st day of January in the year 1902, and that the section 407 alluded to itself referred to the Building Code which should be in effect on said date, and further provided that:

"No right or remedy of any character shall be lost or impaired or affected by reason of this chapter. This chapter shall not affect or impair any act done or right accruing, accrued or acquired or penalty, forfeiture or punishment incurred prior to the time when this act takes effect, or by virtue of any law repealed or modified by this chapter, but the same may be asserted, enforced, prosecuted or inflicted as fully and to the same extent as if this act had not been passed or said law had not been repealed or modified."

As the building in question was commenced and completed in the year 1901, and as the act under consideration did not take effect until the 1st of January, 1902, it is obvious that if the encroachments complained of were illegal, and if the provision of the Building Code was without force and effect because ultra vires the municipal assembly, then the right existing to abate the nuisance by enforcing the removal of the unlawful private encroachment in the public street, then possessed by the city, was not in the slightest degree affected by the section of the charter of 1901 relied upon.

This court said in City of New York v. Knickerbocker Trust Co., 104 App. Div., 223, 93 N. Y. Supp. 937:

"It is argued that by section: 41 of the Revised Greater New York Charter ordinances not inconsistent with the charter and in full force on January 1, 1902, are 'continued in full force and effect.' But they are not continued as part of the statutory law incorporated in the provisions of the charter. They are simply continued in force as ordinances. They are given no higher sanction nor greater dignity than they had previously."

So that the question of whether the Legislature could authorize the permanent invasion of the public streets in the interests of a private owner is not in this case. No statute is called to our attention in which the Legislature has explicitly attempted so to do. It has, however, recognized the right of the city to institute proceedings to remove structures in the street by passing statutes of limitations in that regard. Chapter 610, Laws of 1896, amended section 471 of the Consolidation Act (chapter 410, Laws 1882), by providing that if the front or other exterior wall of any building now standing in the city of New York shall extend not more than four inches upon any street, and if a structure, part of a building now standing in said city, known as a bay window or oriel window, shall extend not more than twelve inches upon any street, the same should not be removable unless an action or proceeding shall be instituted by or in behalf of the mayor, aldermen, and commonalty within one year from the passage of the act. This section of the Consolidation Act was further amended by chapter 646 of the Laws of 1899, by substituting ten for four inches in the provision for the front or exterior wall encroachment. So far from authorizing such encroachments in the future, said acts recognized the unlawful character of the structures, notwithstanding the ordinances alluded to in the opinion of the learned referee limited the effect of the remedial statutes to buildings then standing, and simply provided a short statute of limitations as against the city as to such buildings.

We come, therefore, directly to the proposition whether any municipal body, administrative or legislative, had the power to authorize such encroachment, and the answer to that question seems to me to be conclusively found in adjudicated cases.

In Ackerman v. True, 175 N. Y. 353, 67 N. E. 629, although the respondent cited Wormser v. Brown, 149 N. Y. 163, 43 N. E. 524, and Broadbelt v. Loew, 15 App. Div. 343, 44 N. Y. Supp. 159, authorities here relied upon, the court said:

"It is well established by the decisions of this court that interferences with public and common rights create a public nuisance, and when accompanied with special damage to the owner of lands give also a right of private action to such owner, and that a public nuisance as to the person who is specially injured thereby in the enjoyment or value of his lands becomes also a private nuisance. That this encroachment upon the street was a public nuisance, and that as to the plaintiff it was a private nuisance, we have no doubt. * * * We have been referred to various statutes relating to this subject, upon which the defendant relies to sustain that contention, and from which he urges that the commissioners of parks are invested with power to permit such encroachments and erections as they shall see fit upon certain streets, of which Riverside Drive is one. These statutes we have carefully examined without finding any such authority conferred upon the

park board, or upon any member thereof, as would justify their granting to the owners of property abutting upon the line of such a street a permit or right to extend the main wall of a permanent and substantial structure three feet and six inches into and beyond the line of the street. If they possess any such power, it is unlimited, and they may authorize an extension into the streets a much greater distance, and the purpose for which such streets were laid out may be greatly impaired or entirely defeated. Any such construction of that statute would result in practically annulling that portion of the charter of Greater New York, which provides that streets and other public places in the city shall be inalienable. Section 71. Although it is true that the title of the streets of the city of New York is in the municipality, that title is held by it in trust for public use, and not even the municipal assembly has authority to permit permanent encroachments thereon. * * * When, however, that provision is considered in connection with the other provisions of the charter relating to the inalienability of the streets, and depriving even the municipal assembly of any power to authorize the erection or continuance of any encroachments upon the streets, it becomes quite manifest, we think, that the Legislature did not intend thereby to confer upon a member of the park board the right to permit an abutting owner upon any of the streets of the city, whether within any park or outside, to encroach upon the street by the erection of permanent and substantial structures thereon. Moreover, if that statute were to be thus construed, its constitutionality would be at least doubtful, for even the Legislature cannot authorize the condemnation of private property for other than public uses."

In Deshong v. City of New York, 176 N. Y. 475, at page 483, 68 N. E. 880, at page 882, Martin, J., said:

"The title to the streets being in the city as trustee for the public, no grant or permission can be legally given which will interfere with their public use. The right of the public to the use of the streets is absolute and paramount to any other. A presumption of consent, or even an actual consent by the authorities to their use for private purposes, is always subject and subordinate to the right of the public whenever required for public purposes, and such a grant or right cannot be presumed when it would have been unlawful. * * * In other words, there can be no rightful, permanent possession of any part of a public street for private purposes, unless by virtue of an authorized permission of the city, and no length of time will render legal a private interference with a street which is a nuisance, or give the person maintaining it any right to continue it as against the municipality."

In City of New York v. Knickerbocker Trust Co., supra, Mr. Justice Patterson said:

"The city cannot give permission to an owner of property to erect any part of his building on the public highway."

In McMillan v. Klaw & Erlanger Co., 107 App. Div. 407, 95 N. Y. Supp. 365, Mr. Justice O'Brien said:

"The municipality has an interest in the street by reason of its being vested with the fee thereof, but this fee is a qualified one, being held by it in trust for the public use and benefit, and that use cannot be departed from without violating an essential condition of the contract between it and the abutting property owners, as expressed by the adjudications in the street opening proceeding under which the land was obtained. * * * If the legality of the ordinance be sustained, it would permit individuals to appropriate from two to five feet of public property all along the streets of the city and under the guise of ornamental projections to devote the land to whatever uses their private interests might require. * * * Ordinances which thus devote public property to private uses are not looked upon with favor, and the courts will scan them closely with a desire to jealously guard the rights of the public from illegal invasion under the guise of municipal authority."

In Williams v. Silverman Realty & Constr. Co., 111 App. Div. 679, 97 N. Y. Supp. 945, this court said:

"Whatever cases may be in the books which tend to support a different rule must be held to be overruled by the Ackerman and McMillan Cases until, at least, the Court of Appeals has again passed upon the question."

In Hatfield v. Straus, 117 App. Div. 671, 102 N. Y. Supp. 934, affirmed in 189 N. Y. 208, 82 N. E. 172, this court said:

"But the moment such a right is given for the exclusive use of a private individual there has been a taking of public property for private use which cannot be justified. The streets of the city of New York belonging to all the people have been subjected to many invasions for the benefit and use of private owners. Of late years it has been realized by the courts how dangerous such invasions have been, and in Ackerman v. True, 175 N. Y. 353 [67 N. E. 629], and in McMillan v. Klaw & Erlanger Co., 107 App. Div. 407 [95 N. Y. Supp. 365], and in Williams v. Silverman Realty & Constr. Co., 111 App. Div. 679 [97 N. Y. Supp. 945], the Court of Appeals and this court have announced the doctrine that the board of aldermen or other local authority having control over the streets for certain purposes had no power to permit invasion thereof for private use, and, if there was any local legislation which could be invoked as an authority in that regard, it would be unconstitutional as attempting to authorize the taking of private property for private use or the taking of public property for private use."

In People ex rel. Cross Co. v. Ahearn, 124 App. Div. 840, 109 N. Y. Supp. 249, Mr. Justice Ingraham concurring, said:

"I concur in the result upon the ground that the common council has no power to permit an abutting owner to encroach upon the public street, the fee of which is held by the municipality in trust for the public without express authority from the Legislature, and the Legislature has granted no such express authority as would justify the ordinance relied on to sustain this encroachment. I think such action by the common council unauthorized whatever its object. The public are entitled to the free and unrestricted use of the streets and avenues in the city of New York which have been acquired by the city and are held in trust for the public use, and which have been paid for by abutting owners by assessments imposed by operation of law upon the theory that the opening of the street or avenue would be a benefit to such abutting owner. To authorize any one to appropriate the streets to private use would be an appropriation of property thus acquired, and in which all the abutting owners have an interest, and certainly would require express legislative sanction."

In Village of Oxford v. Willoughby, 181 N. Y. 155, 73 N. E. 677, Gray, J., said:

"Plaintiff brought this action in equity to enjoin the defendant from encroaching upon one of its public streets by the erection of an addition to a building and to compel the removal of the encroachment. * * * The trial court found the structure to be an obstruction and a nuisance and rightly so, for that amounts in law to a public nuisance which obstructs the public highway. Wakeman v. Wilbur, 147 N. Y. 657, 663 [42 N. E. 341]."

In City of New York v. Rice, 198 N. Y. 124, 91 N. E. 283, 28 L. R. A. (N. S.) 375, the city sued to restrain defendant from maintaining and to compel him to remove a masonry well upon his property which, with its pillars, extended on Eighty-Ninth street six feet beyond the house or building line, and on Riverside Drive seven feet. Rice obtained permission by resolution of the municipal assembly, and further he obtained a permit from the commissioner of parks,

and the wall was erected in substantial compliance with the permission. Gray, J., said:

"It is a question simply of the existence of any power in the municipality to consent to a permanent use of any part of a street for private purposes. * * * The ownership by the city of the fee of the land in the streets is impressed with a trust to keep the same open and for use as such. The trust is publici juris—that is, for the whole people of the state—and is under the absolute control of the Legislature; in which body, as representing the people, is vested power to govern and to regulate the use of the streets. There is no right in the city to use its property therein as it might corporate property, nor otherwise than as the Legislature may authorize for some public use or benefit. * * * It follows from the nature of its title that the city cannot dispose of the streets, nor divert them to private uses. Whatever the power of control, or of regulation, possessed by the Legislature, it is restricted in the direction of what may be deemed to be a public use, having in view, of course, the demands of a progressive civilization. * * * The streets were opened for the unrestricted use of the public, and the assessments for the costs were levied upon the properties benefited, and were paid, upon the implied promise that they should be maintained, in all their integrity, as public highways. Any erection of permanent and substantial structures thereon not in a public use would constitute an encroachment or obstruction, and would therefore be a public nuisance. * * * Not only, therefore, does the nature of the title by which the municipality holds the streets forbid the inference of any implied power to grant permission relied upon in this case, but such a power was in express terms withdrawn by a provision of the charter in force at the time. It contains the provision that the municipal assembly shall have power to regulate the use of the streets and highways, but they shall have no power to authorize the placing or continuing of any encroachment or obstruction upon any street or sidewalk except the temporary occupation thereof during the erection or repairing of a building on a lot opposite the same. Charter of 1897, § 49, subd. 3. This provision, as construed by this court, denies to the municipal authorities any power to consent to the private use of any part of the street as laid out."

Referring to Ackerman v. True, the court said:

"It was thought that the constitutionality of the statute, if construed to confer the power to permit such, would be very doubtful. * * * It may be further observed that in the present case it is the city which is invoking the aid of the courts in undoing that which has been illegally done. Our decision of Ackerman v. True has been followed in several well-considered opinions by the Appellate Division of the Supreme Court, and its authority should not now be questioned. See City of New York v. Knickerbocker Trust Co., 104 App. Div. 223 [93 N. Y. Supp. 937]; McMillan v. Klaw & Erlanger Constr. Co., 107 App. Div. 407 [95 N. Y. Supp. 365]; Hatfield v. Straus, 117 App. Div. 671 [102 N. Y. Supp. 934]; People ex rel. Cross Co. v. Ahearn, 124 App. Div. 840 [109 N. Y. Supp. 249]."

In People ex rel. Browning, King & Co. v. Stover, 145 App. Div. 259, 130 N. Y. Supp. 92, Mr. Justice Scott said:

"It cannot be questioned for a moment that the projections of which the plaintiff complains are unlawful obstructions upon the public highway, and constitute a public nuisance which it is the duty of the public authorities to abate. Ackerman v. True, 175 N. Y. 353 [67 N. E. 629]; City of New York v. Rice, 198 N. Y. 124 [91 N. E. 283, 28 L. R. A. (N. S.) 375]; People ex rel. Cross Co. v. Ahearn, 124 App. Div. 840 [109 N. Y. Supp. 249]; City of New York v. Knickerbocker Trust Co., 104 App. Div. 223 [93 N. Y. Supp. 937]. And it is equally well settled that no permit from the park department or any other municipal body could legally authorize the erection and maintenance of such encroachments. What was said in Wormser v. Brown, 149 N. Y. 163 [43 N. E. 524], apparently recognizing the right of the park commissioner to

139 N.Y.S.—18

permit encroachments in certain cases, no longer expresses the law. Ackerman v. True, supra. * * * So also in an equitable action, when it appears that the obstruction has existed for more than 20 years, the court may infer a consent on the part of the adjoining owner that, so far as his private interest is concerned, the obstruction may remain. It was such an implied' consent that this court had in mind in 556 & 558 Fifth Avenue Co. v. Lotus Club, 129 App. Div. 339 [113 N. Y. Supp. 886]. The question there was whether or not a slight projection over the street, easily removable without injury to the building, served to render the title unmarketable. It had existed for many years and under a statute referred to in the opinion the city could not compel its removal. * * * But this is not such a case. It is an application to compel public officers to perform a duty which they owe to the public, which they could, and perhaps should, perform without the necessity for the prod of a mandamus. Their duty to act rests, not upon any private injury done to relator (People ex rel. Pumpyansky v. Keating, 168 N. Y. 390, 61 N. E. 637), but upon the respondents' infringement upon the property and rights of the public. Their duty to act is not lessened by the fact that some of the obstructions have been in existence for a long time, and that relator and its predecessors in interest have not complained, because no prescriptive right to occupy the streets can be gained as against the public, and no adjoining owner can legalize such an obstruction by acquiescence, even if he may debar himself from asserting his private right to have it removed."

Although the foregoing cases represent the present condition of the law of the state, the respondent relies on earlier cases which have in effect been overruled. And those cases, based upon the conditions existing at the time when rendered, contain expressions which demonstrate their present inapplicability.

[3] In Broadbelt v. Loew, 15 App. Div. 343, 44 N. Y. Supp. 159, decided in 1897 and cited by respondent, Mr. Justice Patterson said:.

"In view of the ordinance of the common council of the city of New York, and after acquiescence of the authorities of the city in the allowance of constructions such as those connected with the plaintiff's houses, the possibility of the owner ever being molested is so exceedingly remote that the objections become technical only and not substantial."

And in Levy v. Hill, 50 App. Div. 294, 63 N. Y. Supp. 1002, decided in 1900, cited by respondent, Mr. Justice Ingraham said:

"This stoop has been in its present condition for upwards of thirty years without objection on the part of the municipality or any of the adjoining property owners. That any serious objection by any one could now be made to the continuance of this stoop in the condition it is in is such a remote contingency that it hardly could be considered a serious objection to the title."

Neither of those opinions could have been written at the present date. The tremendous growth of the city in the last decade, the hurrying throngs who press through its congested streets and avenues, have required the widening of the roadways and the clearing of the sidewalks. The action of the city authorities has not only had the approval of the courts, but they have compelled them to take action. People ex rel. Cross Co. v. Ahearn, 124 App. Div. 840, 109 N. Y. Supp. 249; People ex rel. Ackerman v. Stover, 138 App. Div. 237, 122 N. Y. Supp. 1030; People ex rel. Browning, King & Co. v. Stover, 145 App. Div. 259, 130 N. Y. Supp. 92. And there is submitted in the brief of counsel a table, which is not questioned, of the resolutions passed by the municipal authorities directing the removal of encroach-

ments in the public streets, 52 in number, passed between July 29, 1910, and March 7, 1912, covering all parts of the city. One of them affects 125th street—in the immediate neighborhood of the locus in quo.

With the illegality of the structures established by the courts, and with the power of removal ·by the city officials not only sustained but action compelled by the mandate thereof, and with the extensive operations of the civic authorities, looking to the clearing of the streets, covering a great portion of the borough of Manhattan, it can no longer be said that the contingency of interference on such thoroughfares as 116th street and Manhattan avenue is so remote that it should not be taken into consideration as affecting the marketability of the title to real estate.

The structure being without warrant of law, the power existing to compel its removal, the exercise of that power seriously affecting the property, its probability being no longer so remote as to be negligible, a purchaser ought not to be compelled against his will to take a title so burdened.

[4] If there is one thing thoroughly established by an unbroken line of cases in this court and in the Court of Appeals, it is this: That the streets of the city of New York, acquired under the doctrine of eminent domain for the use and benefit of all the people of the state as public highways, paid for by assessments upon private property upon the sole excuse that such property was assessed to pay for a public benefit, belong to all the people of the state for the sole purpose for which they could be lawfully acquired and so paid for. There exists no power in any local authority whatsoever to authorize any private individual to appropriate for his own benefit any portion of that public property by a permanent structure for his own use. The interests of the public are superior to those of the individual. The necessities of the public have required a gradual retaking of its own which it has carelessly or thoughtlessly, or because there was no necessity at the time, allowed to be filched from it. But the time has come when the city needs the full width of its streets, and before that public need private interests must bend. It follows that if any private individual in defiance of the law, and with or without any knowledge or consent, express or implied, of the local authorities, does so appropriate a portion of the public streets, he will not be protected in his aggression by the courts. He has himself put a cloud upon his title to his own land which will authorize the rejection thereof by a prospective buyer.

The fourth finding of fact should be reversed in so far as it finds that the plaintiff was ready and willing to fulfill and perform said agreement in all respects on its part and the fifth, sixth, and seventh proposed findings of defendant, refused to be found, are adopted.

The twelfth, fifteenth, and sixteenth findings are reversed. The seventeenth, eighteenth, nineteenth, and twenty-first of defendant's proposed findings of fact, refused ·by the referee, are adopted.

The judgment is reversed and judgment ordered dismissing the complaint on the merits and directing judgment for the defendant on the

counterclaim for $5,266.87, with interest, with costs and disbursements to the appellant in this court and in the court below.

McLAUGHLIN and DOWLING, JJ., concur. SCOTT, J., dissents.

INGRAHAM, P. J. I concur in the result of Mr. Justice CLARKE'S opinion. The encroachments upon the public streets of the building upon the lot in question are of such a substantial character, and their removal would involve such a defacement of the building, that I do not think that a purchaser should be compelled to take a title to the property.

SCOTT, J. (dissenting). The facts of the case are so thoroughly discussed in the opinion of the referee and in the prevailing opinion in this court that I shall do no more than briefly indicate the grounds upon which I vote for an affirmance of the judgment appealed from.

I think that it is, at least, very doubtful whether any municipal body or officer has authority to consent to the occupation of any part of the public street for other than strictly street purposes, but, apart from the question of the legality of the projections complained of, I am of opinion that, even admitting that they are unlawful, they do not justify us in holding that the title is unmarketable. It is well settled that it is not every defect of the nature complained of here, which will justify a rejection of the title. If it were so, there would be very few marketable titles in the city of New York, except to vacant lots. The question in every case like the present is whether the encroachment is of a character which will probably invite attack.

There are two sources from which such an attack may be looked for. One is from the owners of adjoining or adjacent property who may find a private injury in the encroachment on a public street. That was the condition found in Ackerman v. True, 175 N. Y. 353, 67 N. E. 629. There the encroachment amounted to about 3½ feet, and it was distinctly found that it interfered with plaintiff's easements of light and air. Here it appears from the evidence and the findings that the encroachments complained of do not to any extent interfere with any easement of light, air, prospect, or access to any adjoining owner, or any easement appurtenant to any adjoining owner. It may be safely said, I think, that there is no appreciable danger of a successful attack from an adjoining owner. The second possible source of attack is from the city. This danger I think is negligible so far as concerns bay or oriel windows commencing at the second and third stories, respectively. They constitute no obstruction to the free use of the street for street purposes, and herein the case is distinguishable from City of New York v. Rice, 198 N. Y. 124, 91 N. E. 283, 28 L. R. A. (N. S.) 375, and similar cases where the encroachments complained of actually impeded the free use of the street by the public. I do not say that the city might not successfully compel the removal of the encroaching windows all the way up to the roof of the building, but the probability of such action by the municipal authorities is so remote that it need

not be considered. Not only has the city for more than a century authorized, so far as it could do so lawfully, bay windows projecting not more than a foot beyond the building line, but its efforts in the way of compelling the removal of obstructions in and encroachments upon the street have not heretofore been directed towards the removal of insignificant encroachments so far above the street surface as are the bay or oriel windows now under consideration. There remains to be considered only the one bay which is built up from the foundation, for even the prevailing opinion concedes that the portico steps, and the shop windows do not furnish a sufficient reason for rejecting the title.

The one bay, which begins at the foundation, may perhaps be the object of attack by the city, although I do not consider the danger of such attack as very imminent. Assuming, however, that it is attacked, the cost of·removing so much of it as is below the second story could not be.very great, and the doctrine of de minimis may well be applied. Furthermore, the encroachment of the window in question, as well as the portico, were open, visible, and notorious when the contract was made, and it therefore will be considered as having been made with knowledge. This is not a case where the vendor cannot convey all that it has contracted to sell, for concededly he can do that. The claim is that the property is subject to attack because of an unlawful encroachment on the street. The danger of such an attack is in my opinion so remote that it cannot affect the marketability of the title. Broadbelt v. Loew, 15 App. Div. 343, 44 N. Y. Supp. 159, affirmed on opinion below 162 N. Y. 642, 57 N. E. 1105; Levy v. Hill, 70 App. Div. 95, 75 N. Y. Supp. 19, affirmed on opinion below 174 N. Y. 536, 66 N. E. 1112; Empire Realty Corporation v. Sayre, 107 App. Div. 415, 95 N. Y. Supp. 371; Webster v. Kings County Trust Co., 145 N. Y. 275, 39 N. E. 964; Fifth Ave. Realty Company v. Lotus Club, 129 App. Div. 339, 113 N. Y. Supp. 886.

In my opinion the judgment should be affirmed.