APPLETON et al. v. CITY OF NEW YORK. (No. 5913.)

(Supreme Court, Appellate Division, First Department. July 10, 1914.)

1. MUNICIPAL CORPORATIONS (§ 668*)—USE OF STREETS—VAULTS—PRESUMPTIONS.

The presumption of a permission to maintain certain vaults underneath the surface of a street arising from a great lapse of time during which vaults have been maintained is overcome by the fact that the vaults were constructed since 1859 and that since that year no such vaults could be built without a permit, and that the records show that no permission for their construction was ever applied for by the owner or his predecessors in title.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1444; Dec. Dig. § 668.*] ·

2. MUNICIPAL CORPORATIONS (§ 658*)—ACQUISITION OF STREETS—TITLE ACQUIRED.

A city acquiring a street under act of 1691 (1 Colonial Laws, p. 269) presumptively followed the proceedings prescribed by the act and acquired the fee, provided the fee could be acquired thereunder.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1430; Dec. Dig. § 658.*]

3. PUBLIC LANDS (§ 188*)—ANCIENT GRANTS—CONFIRMATION—EFFECT.

Where a grant under the civil law, under which the sovereign acquired the fee of lands laid out for public streets, was confirmed by the English on the sovereignty passing to the English, it was merely a confirmation of titles existing, and should not be construed as an additional conveyance of rights vested in the sovereign under the civil law.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 601–611; Dec. Dig. § 188.*]

---

*For other cases see same topic & § NUMBER*in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. MUNICIPAL CORPORATIONS (§ 658*)—ACQUISITION OF STREETS—TITLE AC-
QUIRED.
Where a city acquiring a street under the act of 1691 (1 Colonial Laws,
p. 269) acquired the fee, the city widening the street pursuant to Laws
1784, c. 56, acquired the fee of the street as widened.
[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §
1430; Dec. Dig. § 658.*]

5. BOUNDARIES (§ 20*)—DESCRIPTION—FEE OF STREETS.
Where the record title under which one claimed land showed that the
premises were bounded by a street and not by the line of the street, the
description would include the fee to the center of the street, provided the
grantor owned the fee.
[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 123–130, 132;
Dec. Dig. § 20.*]

6. MUNICIPAL CORPORATIONS (§ 668*)—STREETS—RIGHTS OF ABUTTING OWNER.
An abutting owner, whether owning the fee of a street or not, may not
maintain vaults under the surface of the street without a permit, and
the maintenance of the vaults without a permit, in violation of a mu-
nicipal ordinance, is a public nuisance, which may be abated.
[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §
1444; Dec. Dig. § 668.*]

7. MUNICIPAL CORPORATIONS (§ 668*)—STREETS—OBLIGATION OF MUNICIPALITY.
A city owes the duty to the traveling public to exercise reasonable care
to maintain the streets in safe condition, and it must supervise the con-
struction of vaults beneath the surface and inspect the same, and require
that they be safely constructed and maintained, regardless of whether or
not the city owns the fee of the street; and the city may exact a rea-
sonable fee for the expenses of the supervision of the construction of
vaults and inspection thereof.
[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §
§ 1444; Dec. Dig. § 668.*]

8. MUNICIPAL CORPORATIONS (§ 668*)—USE OF STREETS BY ABUTTING OWNERS—
CONSTRUCTION OF VAULTS.
Where an abutting owner must apply to the city for a permit for the
construction of vaults beneath the surface, and the city exacts an unrea-
sonable fee therefor, the owner may, by mandamus or otherwise, compel
the granting of a permit on payment of a reasonable fee for. the ex-
penses to which the city may be subjected by supervising the construc-
tion of the vaults and the inspection of them to make the street safe for
travel.
[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §
1444; Dec. Dig. § 668.*]

9. MUNICIPAL CORPORATIONS (§ 668*)—USE OF STREETS BY ABUTTING OWNERS
—CONSTRUCTION OF VAULTS.
Where a city owns the fee of a street, a permission to construct a
vault beneath the surface of a street by the abutting owner is a revocable
license, and when the public interests, whether for street uses or other
public purposes, require the use of the space or any part thereof in which
a vault has been permitted, it must revoke the permit.
[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §
1444; Dec. Dig. § 668.*]

10. MUNICIPAL CORPORATIONS (§ 668*)—USE OF STREETS BY ABUTTING OWNERS
—CONSTRUCTION OF VAULTS.
A city owning the fee of a street may arbitrarily refuse to grant a
permit for the construction of vaults beneath the surface, and may exact

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

such charges as in the judgment of the local officials vested with authority may deem proper.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1444; Dec. Dig. § 668.*]

11. EMINENT DOMAIN (§ 100*)—COMPENSATION—STREETS—RIGHTS OF ABUTTING OWNERS.

An owner of land abutting on a public street who owns the fee of the street is entitled to substantial damages on being deprived of rights of control of the street when the fee is taken from him, though there is full public control with the right in the municipality to appropriate the bed, as well as the surface of the street, for any street use.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 256–264, 267; Dec. Dig. § 100.*]

12. MUNICIPAL CORPORATIONS (§ 668*)—USE OF STREETS—CONSTRUCTION OF VAULTS—ORDINANCES.

An ordinance of a city, which authorizes the granting of permission for the construction of vaults beneath the surface of the streets and paying for the privilege a sum calculated at a rate not less than 30 cents nor more than $2 per foot for each square foot of ground required for a vault, does not impose a tax or rental for the use of land claimed by the city, but imposes a charge to indemnify it against the expenses to which it will be subjected in the performance of its duty of supervision, inspection, and maintenance, and is not unreasonable.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1444; Dec. Dig. § 668.*]

Appeal from Special Term, New York County.

Action by William W. Appleton and others against the City of New York. From a judgment (82 Misc. Rep. 258, 144 N. Y. Supp. 138), enjoining defendant from enforcing against plaintiffs certain ordinances, by requiring the payment of compensation therein fixed for the use of vault space under a street, defendant appeals. Reversed, and complaint dismissed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Terence Farley, of New York City (Leon N. Futter, of New York City, on the brief), for appellant.

J. Hampden Dougherty, of New York City, for respondents.

LAUGHLIN, J. The plaintiffs are the owners as tenants in common of premises situate on the northwesterly corner of Broadway and Cortlandt street, borough of Manhattan, New York, known as No. 173 Broadway; and they claim to be the owners of the fee to the center line of Cortlandt street adjacent thereto, subject to the public easements for street purposes. They concede that the city has the right to regulate their use of the street in front of their premises to the center line thereof for vaults or otherwise, but they contend that it has no right to compel them to pay for such use. The only theory on which the learned counsel for the respondents attempts to support the judgment is that his clients own the fee of the street to the center line thereof. The trial court found that plaintiffs own such fee, but that the construction of the vaults has not been authorized, and that

they have no right to construct and maintain vaults under the street without obtaining a permit therefor. The learned counsel for the city contends that the court erred in finding that the city does not own the fee, and, even though it does not, in deciding that plaintiffs own it; and he also argues that the judgment cannot be sustained in any event, for he argues that if the fee be in the abutting owners, the city has a right to make a reasonable charge for permitting the construction of vaults, and that the amount exacted by the city ordinance is reasonable.

[1] The uncontroverted evidence shows that there is a building on the premises of the plaintiffs, and that there are vaults under Cortlandt street, adjacent thereto and used therewith, occupying a superficial area of 1,097.85 feet of said street. The premises of the plaintiffs are now occupied by a tenant under a lease of the entire building, and the tenant uses the vaults for the storage of merchandise and for toilets. In the year 1859 there were in force and effect municipal ordinances duly adopted, requiring the written permission of the Croton Aqueduct Board and the payment to the city of 15 cents per square foot for the right to construct and maintain vaults or cisterns in any public street; and records of permits for vaults were kept in the bureau of highways since about the month of May, 1857. The only application for a permit for the construction of a vault in Cortlandt street in front of the plaintiffs' premises is one made in the year 1887 by Tice & Jacobs. That application shows that the premises now owned by the plaintiffs were then owned and used for business purposes by the New York Steam Company, and that the vault which the applicants for the permit desired to build was to be 4 feet 10 inches in width and 19 feet 1½ inches in length, outside measurement, and to occupy 92.42 square feet, for which they offered to pay the amount of $69.32, which was at the rate of 75 cents per square foot, and that application was granted. The evidence does not show what rights, if any, Tice & Jacobs had, or whom they represented. The trial court found, and the evidence sustains, the findings, that the building now standing on the premises of the plaintiffs was erected prior to the year 1861, "and perhaps as early as the year 1857," and that the vaults in question were constructed *since* the year 1859, and that no permit for the construction or use of the vaults was ever applied for by the plaintiffs or by their predecessors in title. Those findings and evidence of no record of the granting of a permit overcome any presumption that might otherwise arise from the great lapse of time. Deshong v. New York, 176 N. Y. 475, 68 N. E. 880; Title Guaranty & Trust Co. v. City of New York, 205 N. Y. 496, 99 N. E. 160.

An inspector in the bureau of highways discovered that the vaults under Cortlandt street adjacent to the plaintiffs' premises were more extensive than authorized by the permit granted on the application of Tice & Jacobs, and thereupon the consulting engineer of the commissioner of public works on the 3d day of July, 1912, wrote one of the plaintiffs, drawing his attention to the fact that the vault space used by the plaintiffs had not been fully paid for, and stating that, unless payment was promptly made for the additional space, it would be nec-

essary to place the matter in the hands of the corporation counsel for collection, and that unless payment for the additional space was made, the amount of space for which payment had not been made would be cut off. On the 16th day of December thereafter, this action was brought to enjoin the city from interfering with the vaults, or the plaintiffs' use thereof, and to have it adjudged that the city has no right to interfere therewith.

The city contemplated putting in a hydrant in part of the space occupied by the vaults. The trial court found that the use of a portion of the vault space for a hydrant was a street use; and it is manifest that the trial court did not intend, by the decision or by the judgment authorized thereby, to enjoin the city from constructing the hydrant. The decision and judgment, however, do enjoin the city from exacting from the plaintiffs compensation fixed by ordinance duly adopted in the year 1906, and "from interfering in any manner with plaintiffs' use of said vaults by reason of plaintiffs' failure or refusal to pay such compensation." Said ordinances of 1906 were in force at the time the action was brought and at the time of the trial. Section 169 thereof authorizes the presidents of the respective boroughs, among other things, to give permission for the construction of vaults in the streets in their respective boroughs, provided in his opinion the public will not suffer injury thereby. Section 170 *prohibits* the construction of vaults without a written permit from the borough president, under penalty of $100. Section 171 provides as follows:

"Every application for permission to erect such vault or cistern shall be in writing, signed by the person making the same, and shall state the number of square feet of ground which is required for the same and the intended length and width of the same."

Section 172 provides as follows:

"After obtaining permission to construct or make such vault or cistern, and previous to the commencement thereof, the person so applying shall forthwith pay to the borough president granting the permit therefor such sum as he shall certify in the said permission to be just compensation to the city for such privilege, calculated at the rate of not less than 30 cents, nor more than $2 per foot, for each square foot of ground mentioned as required for such vault or cistern, under penalty of $100."

These are the only provisions of the ordinances material to the question presented for decision.

The premises now occupied by Cortlandt street and adjacent premises were vested in the Dutch government as the sovereign, and were granted by Gov. Kieft to one Damen by a "Dutch ground brief" on or about the 25th day of April, 1644. The Dutch capitulated to the English in 1664, and the Articles of Capitulation were signed on the 29th day of August of that year, and by them the inhabitants were *confirmed* in the possession of their property, and the grant by the Dutch Governor to said Damen, we are informed by a stipulation in the record, was *confirmed* by Gov. Nicholls, representing the English sovereign, on or about the 3d day of October, 1667. Sovereignty again passed to the Dutch by conquest August 8, 1673, but by the Treaty of Westminster February 19, 1674, New Netherland was again restored

to King Charles II of England, and it remained under English sovereignty until the war of the Revolution. In the year 1667 the heirs of Damen conveyed the lands now occupied by Cortlandt street and other premises, including those now owned by plaintiffs, to one Van Cortlandt; and his daughter, Catherine Philipse, succeeded to the title by descent. Some time prior to May 25, 1733, her executors and others, who owned premises in the vicinity west of Broadway, laid and staked out a street through their lands from Broadway to the Hudson river, 40 feet in width, which they named Cortlandt street; and on or about that day, they filed with the common council of the city a declaration and petition, reciting the possession of said lands by the petitioners, "as well in their own right or in the right of some of them, and by the Powers and Authorities in them lawfully vested," and that "for the better Improvement" of their lands and "the Increase of Buildings and Inhabitants within the said City," and by "mutual consent and agreement," they laid and staked out said street, and they intended speedily "to lay out the lands on both sides of the said street into lots for buildings"; and that by said declaration and petition, they "declare and make known" that said street "shall forever remain, continue and be a Publick Street and Highway in like manner as the other Publick Streets of this City now are or lawfully ought to be, and therefore pray this their Declaration and Petition may be recorded in the Record of the Common Council of this Corporation." The action of the common council on that petition is shown by the record as follows: "Whereupon it is ordered by this Court that the Prayer of the same petition be granted, and that the same be entered on Record in the Minutes of this Court."

Counsel for the appellant have not cited the Colonial Statutes in force at the time the Cortlandt street was thus laid out as a public street 40 feet in width; but counsel for the respondents cites some of them, and claims that none of them applied to the opening of this street. The Montgomery Charter, sealed on the 15th of January, 1730, and confirmed on the 14th of October, 1732, was in force at that time. It contains no specific provision with respect to the procedure for or the effect of laying out public streets, but merely, in effect, follows the Dongan Charter in vesting in the city the existing streets, and conferring upon it general authority to lay out streets, evidently leaving it to special or other acts to prescribe the procedure and to declare the right, title, or interest acquired. Montgomery Charter, Colonial Laws, vol. 2, pp. 577, 578, 588. Doubtless the provisions of chapter 18 of the Colonial Laws, vol. 1, p. 269, passed October 1, 1691, entitled "An Act Regulating the Buildings Streets Lanes Warfs Docks and Alleyes of the Citty of New Yorke," were in force. That act in effect, constituted the mayor, aldermen, and common council of the city a court for the purpose of laying out streets, and required that notice be given to the owners and parties interested in lands to be *taken* for a street, and provided that "to the end that reasonable satisfaction may be given for all such ground as shall be taken and imployed" for the street, the mayor, aldermen, and common council "shall and may treat and agree with the owners and others interested therein," and in the

event that any owner or person interested therein should refuse to treat with them they were authorized to issue a warrant to the sheriff for the impaneling of a jury "before the said court of mayor and aldermen," and the jury were required upon their oaths to be administered by the court, "to inquire and Assess such Damages and recompence as they shall judge fit to be awarded to the owners and others interested according to their severall and respective Interests and Estates Of any such ground or any part thereof for their respective interests and Estates in the same as by the said Mayor Aldermen and Common Council shall be adjudged fitt to be converted to the purposes aforesaid," and provided that the verdict of the jury and judgment "of the said Court of Mayor and Aldermen thereupon and the payment of the sume and sumes of money so awarded or adjudged to the owners and others having Estate or interest or Tender or refusall thereof shall be binding to all intents and purposes against the said Partyes their heirs Executors Administrators and Assignes and others Claiming any Title or interest to the said ground and shall be a full authority to the said Mayor Aldermen and Common Council to cause the said ground to be Converted and used for the purposes aforesaid."

[2] There does not appear to have been any statute in force at that time with respect to the dedication of streets and the common law with respect to dedication had not been developed. Since the only statutory provisions with respect to procedure on laying out streets at that time were those contained in said act of 1691, which constituted the mayor and aldermen and common council a court, the record, by reciting the action of the court, indicates that the municipal authorities were proceeding under that act. This is not claimed in behalf of the city; but in view of the great lapse of time, I think it must be assumed that the only provisions of law authorizing the laying out of a street were fully complied with, and that the city acquired such title as it could in the circumstances acquire by virtue thereof. The streets in the vicinity, and most, if not all, of those to the south had been laid out under the Dutch rule, and the city had succeeded to the ownership of the fee thereof. The petition indicates that the petitioners intended that the city should have the same right and title to this street as it had to the others. It is reasonable to infer that, under the proceedings taken pursuant to the act of 1691 at that time, the city acquired the fee, if the fee could be acquired thereunder. It is settled by controlling authority construing similar statutory provisions that they were sufficiently broad to authorize the city to acquire the fee if it so desired. Mott v. Eno, 181 N. Y. 346, 74 N. E. 229; Bradley v. Crane, 201 N. Y. 14, 94 N. E. 359. I am therefore of opinion that the presumption on these facts is that the city took the necessary proceedings under the act of 1691 to lay out the street, and that it acquired the fee. See Kane v. N. Y. E. R. R. Co., 125 N. Y. 164, 26 N. E. 278, 11 L. R. A. 640; Bartow v. Draper, 5 Duer, 130; Story v. N. Y. El. R. R. Co., 3 Abb. N. C. at page 497.

[3] I also think that it has the fee on another theory. It is well settled that under the civil law which was in force during the Dutch occupation, and when the grant to Damen by the Dutch ground brief

was made as herein stated, the sovereign acquired the fee of all lands laid out as public streets. Dunham v. Williams, 37 N. Y. 251; Mott v. Clayton, 9 App. Div. 181, 41 N. Y. Supp. 87; Caminez v. Goodman, 119 App. Div. 484, 104 N. Y. Supp. 68; Pooler v. Sammet, 130 App. Div. 650, 115 N. Y. Supp. 578. See, also, Smith v. City of Rochester, 92 N. Y. 463, at page 482, 44 Am. Rep. 393. It was also a rule of the civil law that the sovereign might take lands for public streets without compensation, and that every grant made by the sovereign was subject to this right. Dunham v. Williams, supra, 37 N. Y. at page 253; Bartow v. Draper, 5 Duer, 130, at page 145; Hoffman's Treatise on the Corporation, pp. 256, 257. Our attention has not been drawn to any decision on the question as to whether this right of the Dutch government passed to the English sovereign, and to the state of New York, and by it or by the Dongan Charter from the English sovereign to the city of New York; but Judge Hoffman, who was an authority on the subject, expressed the unqualified opinion that it did, and—

"that it is established, that the fee to every street opened at any time after the surrender, and opened through lands comprised in a Dutch ground brief, vested in the then existing government, or its grantees, unless a different rule has been established by express law," and that there was no law expressing a different rule. Hoffman, Treatise of the Corporation, pp. 256, 257, 259, 269, 291, 292, 293; Hoffman, Estates and Rights of the Corporation, vol. 1, pp. 312, 313. See, also, Story v. N. Y. El. Rd. Co., 3 Abb. N. C. 478, at page 489, and Bartow v Draper, supra, 5 Duer, at page 141. But his views on this point are questioned by Gerard. Gerard's Treatise on the Title of the Corporation and others, page 130. I am of opinion, however, that Judge Hoffman's view is sound. If, as stated by the authorities, the Dutch government was at liberty at any time during its sovereignty to lay out these streets, then the title acquired under the Dutch ground briefs was subject to that right. The confirmation of the Dutch titles by the English was merely a confirmation of those titles as they existed, and should not be construed as an additional conveyance of rights vested in the sovereign not granted by the Dutch ground briefs. Smith v. City of Rochester, supra, 92 N. Y. at page 482, 44 Am. Rep. 393; Mott v. Clayton, supra. The Dutch grants, whenever they have come before the courts for construction, have been construed according to the Dutch law, even though it be in conflict with the common law of England. Smith v. City of Rochester, supra, 92 N. Y. at page 482 et seq.; Mott v. Clayton, supra."

The fact that the proceedings for opening the street were initiated by the owners does not militate against the view that the city acquired the fee. Indeed, the language with which the petition was clothed indicates that the property owners intended that the city should have the same title that it had in the other streets in the vicinity, all, or most of which, were laid out under Dutch rule. Story v. N. Y. El. Rd. Co., supra, 3 Abb. N. C. at page 489. Therefore, on both grounds I am of opinion that the city acquired the fee of the original street. This ruling will tend to fix the same status with respect to all of the streets of the city, and will, I think, serve a great public convenience without interfering with any vested property rights, and there will be no occasion for apprehension with respect to the laying out of new streets over land held under Dutch ground briefs, for the land is all now extensively improved, and it is improbable that there will be any attempt on the part of the Legislature or of the local authorities to exercise this reserved right, or to lay out streets without payment of

the just compensation that has been required in other cases since the Constitution of 1821.

[4] It appears by stipulation that shortly prior to the 9th day of January, 1788, this street "had been widened by taking five feet on the southerly side and five feet on the northerly side thereof, under and in pursuance of an act of the Legislature of the state of New York, known as chapter 56, Laws of 1784, passed May 4, 1784"; that on the 21st day of May, 1784, a petition was presented to the common council to have this street "dug down," so that the descent might be easy and the water from Broadway led into the Hudson river; that on June 2, 1784, a committee appointed by the common council to consider the matter reported, recommending the regulation of a grade of the street; that the report was approved, and the committee was ordered to carry the regulation into effect at the expense of the proprietors of the land; that pursuant to said act of 1784, certain commissioners were appointed, and they reported to the common council on June 9, 1784, recommending that the street be widened by taking five feet from the front of the lots on each side of it, and their recommendation was approved by the common council; and that thereafter and during the same month, a survey of the street was ordered, and the proprietors of the lots were directed to pave it, and in August, 1788, the common council ordered that the clerk prepare ordinances for completing the paving of the street, and they were adopted on the 17th day of May, 1791.

Chapter 56 of the Laws of 1784, pursuant to which, according to the stipulation, the street was widened, does not contain appropriate provisions either for acquiring the fee or even an easement for widening; but if, by virtue of the implied conditions in the Dutch ground brief, the fee reverted to the sovereign on the laying out of the street, then the fee of the widened part of the street would pass to the city. If, however, this were not so, the act of 1784 must be construed with the act of 1691, which apparently remained in force at that time, and, if the views I have expressed are correct, under it a fee could be taken, and it must be presumed that it was taken.

[5] It is also contended in behalf of the city that if it did not acquire the fee to the street, the plaintiffs failed to show that they acquired such fee. There would seem to be no force in this contention, for the record title under which the plaintiffs claim shows that the premises were bounded by Cortlandt street, and not by the line of that street, and under well-settled rules that description included the fee to the center of the street, provided the grantor owned the fee (Dunham v. Williams, supra), but since he did not own it, of course he could not convey it. I am also of the opinion that the learned counsel for the corporation is right in his contention that the judgment could not be sustained even if it should be decided that the plaintiffs own the fee of the street.

[6] The trial court, as already observed, decided, not only that no permit has ever been obtained for the construction of the vaults, but that the plaintiffs have no right to maintain the vaults without obtaining a permit therefor from the city. There is no doubt that an abut-

ting owner, whether owning the fee or not, cannot open the surface of a street or make an excavation underneath the surface without a permit therefor. See Jorgensen v. Squires et al., 144 N. Y. 280, 39 N. E. 373, for with respect thereto there is but little distinction on principle depending on fee ownership. See, also, City of Buffalo v. Stevenson, 207 N. Y. 258, 100 N. E. 798; Dillon on Municipal Corps. (5th Ed.) vol. 3, §§ 1178, 1180.

[7] Maintaining the vaults without a permit is a violation of the ordinance, and constitutes a public nuisance which the plaintiffs could be required to abate. City of New York v. De Peyster, 120 App. Div. 762, 105 N. Y. Supp. 612, affirmed 190 N. Y. 549, 83 N. E. 1123; People ex rel. Browning, King & Co. v. Stover, 145 App. Div. 259, 130 N. Y. Supp. 92, affirmed 203 N. Y. 613, 96 N. E. 1126; People ex rel. Ackerman v. Stover, 138 App. Div. 237, 122 N. Y. Supp. 1030; People ex rel. Cross Co. v. Ahearn, 124 App. Div. 840, 109 N. Y. Supp. 249; City v. Rice, 198 N. Y. 124, 91 N. E. 283, 28 L. R. A. (N. S.) 375; Acme Realty Co. v. Schinasi, 154 App. Div. 397, 139 N. Y. Supp. 266. The learned counsel for the respondents concedes the right of the city, not only to use the surface of the street for public street purposes, but also its right to use the subsurface underneath the street for any *street* use, and that an abutting owner, even though he owns the fee of the street, has no right to construct a vault under the street without a permit from the city. He contends, however, that the ordinances of 1906 apply only to vaults constructed in streets of which the city owns the fee. The city owes a duty to the traveling public and to those lawfully in occupation of any part of the subsurface of the streets to exercise reasonable care to maintain the streets in a safe condition. That duty required the city to supervise the construction of vaults, and to inspect the same from time to time, and to require that they be safely constructed and maintained; and regardless of whether the city does or does not own the fee of the street, in permitting an abutting owner to construct a vault under a street, the city has a right to exact a reasonable fee to cover the expenses to which it will be subjected in supervising the construction of the vaults and in inspecting them, and in seeing that they are properly constructed and safely maintained. City of Buffalo v. Stevenson, supra. See, also, Dillon on Municipal Corps. (5th Ed.) vol. 3, §§ 1178, 1180. If, as the trial court decided, the plaintiffs have not the right to maintain the vaults without a permit from the city, they are not entitled to enjoin the city from interfering with or filling up the vaults.

[8] The question as to what amount the city is authorized to exact as a condition of granting a permit is not really presented for decision. If, as the trial court has found, and as we think, the plaintiffs require a permit, it is their duty to make application therefor, and if an unreasonable fee is exacted, they may, since by the ordinances the city concedes that vaults may, without endangering life or property, be constructed, have a remedy by mandamus, or otherwise, to compel the granting of a permit on payment of a reasonable fee for the expenses to which the city will be subjected as stated. It cannot be held as matter of law that the minimum of 30 cents per square foot pre-

scribed by the ordinance is an unreasonable charge for the city to exact, even if the plaintiffs own the fee to the street.

[9] It is well settled that when the city owns the fee to the street, a permit to construct a vault is a revocable license, and whenever the public interests, whether for *street uses* or other *public purposes*, require the use of the space or any part thereof, in which 'a vault has been permitted to be constructed, it is not only the right, but the duty, of the municipal authorities to revoke the permit. Lincoln Safe Deposit Co. v. City of New York, 210 N. Y. 34, 103 N. E. 768; Lincoln Safe Deposit Co. v. City of New York, 96 App. Div. 624, 88 N. Y. Supp. 912. See, also, Syracuse Water Co. v. City of Syracuse, 116 N. Y. 167, 22 N. E. 381, 5 L. R. A. 546, and Matter of City of Brooklyn, 143 N. Y. 596, 38 N. E. 983, 26 L. R. A. 270; Deshong v. City of New York, supra.

[10] Doubtless where the city owns the fee to the street, it may arbitrarily refuse to grant a permit for the construction of vaults, and, having that authority, it may exact such charges or compensation as in the judgment of the local officials vested with authority in the premises may be deemed proper. Title Guaranty & Trust Co. v. City of New York, supra, 205 N. Y. at page 501, 99 N. E. 160.

[11] I think it is now the settled law of this state that the owner of lands abutting on a public street, who owns not merely easements, but the fee, to part of the adjacent lands in a public highway or street, has greater rights, in some respects, than if he owned only an abutter's easements of light, air, and access, for he has a greater control over the uses to which the highway or street may be put, and consequently is entitled to substantial, as distinguished from nominal, damages for being deprived of such rights of control when the fee is taken from him, even in trust for public street uses (City of Buffalo v. Pratt, 131 N. Y. 293-299, 30 N. E. 233, 15 L. R. A. 413, 27 Am. St. Rep. 592; Rasch v. Nassau Elec. Rd. Co., 198 N. Y. 385, 91 N. E. 785, 36 L. R. A. (N. S.) 645; Mayne v. Nassau Elec. Rd. Co., 151 App. Div. 75, 136 N. Y. Supp. 375; Matter of 116th Street, 1 App. Div. 436, 37 N. Y. Supp. 508; Buffalo, Lockport & Rochester Co. v. Hoyer, 147 App. Div. 205, 132 N. Y. Supp. 31); but, even in such case there is full public control with the right in the municipal corporation to appropriate the bed, as well as the surface, of the street, for any *street use* (see City of New York v. Rice, supra; Acme Realty Co. v. Schinasi, supra; Deshong v. City of New York, supra; City of Buffalo v. Stevenson, supra; Jorgensen v. Squires et al., supra); and the courts have not deemed the ownership of the naked fee in the abutter of any particular value, excepting as it gives him greater control in enjoining improper street uses (see Matter of Rapid Transit Rd. Com'rs, 197 N. Y. 81, 104, 90 N. E. 456, 36 L. R. A. [N. S.] 647, 18 Ann. Cas. 366; Buffalo, Lockport & Rochester Rd. v. Hoyer, supra, 147 App. Div. at page 211, 132 N. Y. Supp. 31). Where the city does not own the fee to the street, it is contended that the owner of the fee has a lawful right to use the subsurface of the street until such time as the space may be required for street uses. The rule has been so stated in some of the authorities (McCarthy v. City of Syracuse, 46 N. Y. 194; Matter

of Gilbert El. Ry., 38 Hun, 438); but that doctrine has been modified (Babbage v. Powers, 130 N. Y. 281, 29 N. E. 132, 14 L. R. A. 398), and, although when duly authorized the privilege of constructing vaults becomes a species of property subject to the right of revocation (Matter of Brooklyn El. R. R. Co., 105 App. Div. 111, 93 N. Y. Supp. 924), still, the sound doctrine must be, and is, that even the abutting owner owning the fee may not open or undermine the street without a permit from the local authorities, who, if they determine that it is compatible with the public interests to grant it, may, even where the applicant owns the fee, impose such reasonable conditions as will protect the municipality against liability to third parties and indemnify it against the expense to which it will be subjected. See Babbage v. Powers, supra; Jorgensen v. Squires et al., supra; Tiernan v. City of Lincoln, 88 Neb. 662, 130 N. W. 280, 32 L. R. A. (N. S.) 1034, and note.

[12] It is contended that the ordinances in question are not appropriate for the granting of a permit to one who owns the fee to the street, and that therefore the plaintiffs were under no obligation to apply for a permit. We are of opinion that that contention is unsound. The ordinances require compensation to be made to the city as a condition of obtaining such permit. They, however, are not to be construed literally, but according to the particular facts. The compensation required by the ordinances is sufficiently elastic to require a different rate of compensation where the abutting owner owns the fee; and it is not to be presumed that the borough president will be unreasonable in determining the compensation to be made. We do not wish to be understood as expressing an opinion that even the maximum compensation provided by the ordinances in question would be an unreasonable license fee to exact of an abutting owner who owns the fee of the street for the privilege of constructing a vault under the street, thus subjecting the city to the expense of supervising the construction and repair of inspection thereof, and to liability for injuries to persons and to property. As already observed, whether the city or the abutter owns the fee, the permit is merely a revocable license, and, I think, it cannot be held, as matter of law at least, that the compensation provided by the ordinances, even at the maximum rate, would be unreasonable if the city did not own the fee of the street. The fact that the compensation prescribed by the ordinances is to be determined by the superficial area of the vault is of no moment, provided the amount exacted is not unreasonable. Title Guaranty & Trust Co. v. City of New York, supra. There is no ground for construing the ordinance as exacting either a *tax* or a *rental* for the use of land claimed to be owned by the city, for they merely provide for a single original flat charge; and the city was authorized to make a reasonable charge to indemnify it against the expenses which it would be subjected to in performing its duty of supervision and inspection and maintenance and repair. Respondent relies on authorities in other jurisdictions which are not controlling, and in which the facts were different.

148 N.Y.S.—56

It follows, therefore, that the findings of fact and conclusions of law inconsistent with these views should be reversed, and findings and conclusions of law to the effect that the city owns the fee, and is entitled to judgment dismissing the complaint with costs, should be substituted therefor, and granting judgment to that effect to be settled on notice. All concur.

(163 App. Div. 274)

GEE v. LEHIGH VALLEY R. CO.

(Supreme Court, Appellate Division, Fourth Department. July 7, 1914.)

1. MASTER AND SERVANT (§ 228*)—LIABILITY FOR INJURIES—STATUTORY PROVISIONS—CONTRIBUTORY NEGLIGENCE.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 670, 671; Dec. Dig. § 228.*]

2. COMMERCE (§ 8*)—LIABILITY FOR INJURIES TO EMPLOYÉS—EXCLUSIVENESS OF CONGRESSIONAL REGULATIONS.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 5; Dec. Dig. § 8.*]

3. MASTER AND SERVANT (§139*)—LIABILITY FOR INJURIES—PROXIMATE CAUSE.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 275, 282, 289, 296; Dec. Dig. § 139.*]

Appeal from Trial Term, Ontario County.