Matter of 201 C-Town LLC v City of Ithaca, N.Y. (2022 NY Slip Op 04069)

Matter of 201 C-Town LLC v City of Ithaca, N.Y.

2022 NY Slip Op 04069

Decided on June 23, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:June 23, 2022

532888
[*1]In the Matter of 201 C-Town LLC, Respondent,
v
City of Ithaca, New York, et al., Appellants.

Calendar Date:April 26, 2022

Before:Egan Jr., J.P., Lynch, Aarons, Reynolds Fitzgerald and Ceresia, JJ.

Aaron O. Lavine, City Attorney, Ithaca (Victor J. Kessler of counsel), for appellants.
Weaver Mancuso Brightman PLLC, Rochester (John A. Mancuso of counsel), for respondent.

Egan Jr., J.P.
Appeals from an order and a judgment of the Supreme Court (McBride, J.), entered February 10, 2021 and April 2, 2021 in Tompkins County, which, among other things, in a combined proceeding pursuant to CPLR article 78 and action for declaratory judgment, granted petitioner's cross motion for summary judgment.
Petitioner owns real property (hereinafter the subject property) in a densely developed area of the City of Ithaca, Tompkins County upon which, in 2015, plans were developed to construct a 44-unit apartment building (hereinafter the project). In 2016, the Planning and Development Board for respondent City of Ithaca granted preliminary, then final, site plan approval for the project. As the site plan contemplated, among other things, the use of adjacent Bool Street as a construction staging and crane set up area, as well as sidewalk closures, site plan approval was conditioned upon the acquisition of a street permit from the City authorizing the obstructions in municipal rights-of-way. Petitioner's contractor submitted a street permit application to the City's Department of Public Works in October 2016 that included a work site plan reflecting the obstructions that would be caused by the project. In January 2017, following payment of a $50 application fee, the permit was issued.
In February 2017, in response to public complaints and concerns about public safety caused by multiple construction projects obstructing municipal rights-of-way, respondent Board of Public Works of the City of Ithaca (hereinafter the Board) adopted a new fee schedule for street permits in an effort to encourage permit holders to minimize their municipal right-of-way usage. The new schedule required, among other things, permit holders to pay:
a $5 daily fee for each obstructed parking space in a municipal right-of-way without parking meters or a pay station;
a $20 daily fee for each obstructed parking space in a municipal right-of-way with parking meters or a pay station;
a fee for closing a sidewalk in residential areas of $100 per week;
a fee for closing a sidewalk in other areas of $200 per week if the sidewalk were diverted into an adjacent parking lane and $500 per week if pedestrians were detoured to the opposite side of the street;
a $50 per day fee for closing a traffic lane; and
a $100 per day fee for closing an entire street.
The new street permit fee schedule took effect immediately for new street permit applicants and, for existing permit holders, in July 2017. Petitioner's contractor was notified of the new street permit fee schedule in February 2017 and was asked to notify City officials whether the work site plan would be modified to reduce the potential fee, after which Todd Fox, one of petitioner's members, inquired as to the fee that would be imposed under that schedule. In response, the Director of Engineering Services for the City's Department of Public Works estimated that a fee of $6,100 per month would be owed under the new street [*2]permit fee schedule. No modifications were made to the work site plan and, in November 2017, the City's Department of Public Works invoiced petitioner for $39,200, representing the amount due under the new street permit fee schedule for petitioner's closure of parking spaces, sidewalks, travel lanes and streets between July and October 2017. Petitioner raised objections to the invoice and only paid a portion of it and then, in March 2018, paid the remaining $31,347 under protest and demanded that the City conduct an audit of its records. In April 2018, counsel for the City responded by advising petitioner that a review of petitioner's street permit plan and other records had been conducted and that the total fee would be reduced to $32,650. Counsel added that the review also revealed that petitioner was obliged to reconstruct Bool Street under the terms of the final site plan approval and that, as a result, petitioner owed the City an additional $24,841 so that the City could perform that work.
Petitioner commenced this combined CPLR article 78 proceeding and declaratory judgment action in July 2018, seeking a declaration that the new street permit fee schedule was invalid and a full refund or, if the fee schedule was held valid, an audit and partial refund. Following an unsuccessful motion to dismiss the petition/complaint, respondents answered and counterclaimed for a declaration that petitioner was obliged to reconstruct Bool Street and an order that petitioner either perform that work or compensate the City for doing so. Following discovery, respondents moved for summary judgment dismissing the petition/complaint and granting their counterclaim, while petitioner cross-moved for partial summary judgment on its claims for a declaration that the new street permit fee structure was invalid and a refund for the full amount of the invoice, as well as for dismissal of petitioner's counterclaim.[FN1] Supreme Court thereafter issued a February 2021 order in which it denied respondents' motion and granted petitioner's cross motion. The terms of that order were implemented in an April 2021 judgment that, among other things, declared the new street permit fee structure invalid, awarded petitioner damages in the amount of $39,200 plus interest, and dismissed respondents' counterclaim. Respondents appeal from both the order and the judgment.
Respondents first argue that Supreme Court erred in invalidating the new street permit fee structure on the grounds that it was an unauthorized tax, and we agree. "Municipal Home Rule Law § 10 (1) (ii) (a) (6) permits [a municipality] to adopt local laws relating to the acquisition, care, management and use of its highways, roads, streets, avenues and property" (New York Tel. Co. v City of Amsterdam, 200 AD2d 315, 317 [1994] [internal quotation marks and brackets omitted]; see NY Const, art IX, § 2 [c] [6]; City of Buffalo v Stevenson, 207 NY 258, 262-264 [1913]). The City exercised that authority by prohibiting [*3]encroachments "above, in, upon, over or beneath any public sidewalk, street or other real property owned by the City . . . without first obtaining" the appropriate license or permit (Code of City of Ithaca § 170-3), and by empowering the Board to issue street permits to allow those encroachments in individual cases (see Ithaca City Charter § C-71; Code of City of Ithaca §§ 170-5 [F]; 170-6 [I]; 342-7 [C]; 342-8 [C]). The power to charge a fee to cover the costs of that regulation is implied, with a fee "characterized as the 'visitation of the costs of special services upon the one who derives a benefit from them,'" such as costs relating to the permit's issuance or subsequent enforcement of its terms (New York Tel. Co. v City of Amsterdam, 200 AD2d at 318, quoting Jewish Reconstructionist Synagogue of N. Shore v Incorporated Vil. of Roslyn Harbor, 40 NY2d 158, 162 [1976]; see Suffolk County Bldrs. Assn. v County of Suffolk, 46 NY2d 613, 619 [1979]; Matter of Torsoe Bros. Constr. Corp. v Board of Trustees of Inc. Vil. of Monroe, 49 AD2d 461, 465 [1975]). If the charged fee exceeds those costs and was "exacted for revenue purposes or to offset the cost of general governmental functions," however, it constitutes an unauthorized tax and is invalid (New York Tel. Co. v City of Amsterdam, 200 AD2d at 317 [internal quotation marks and citations omitted]; see Matter of Phillips v Town of Clifton Park Water Auth., 286 AD2d 834, 834-835 [2001], lv denied 97 NY2d 613 [2002]).
With that framework in mind, the right of the public to use the City's streets "is absolute and paramount," and individuals have no similar right to obstruct that access (Cities Serv. Oil Co. v City of New York, 5 NY2d 110, 115 [1958] [internal quotation marks and citation omitted], cert denied 360 US 934 [1959]; see New York State Pub. Empls. Fedn., AFL-CIO v City of Albany, 72 NY2d 96, 101 [1988]; City of Buffalo v Stevenson, 207 NY at 261-262). As such, although a municipality is empowered to permit an individual to obstruct public streets and sidewalks, it may also "do all such things, or . . . impose all such reasonable conditions, in relation to [the obstructions], as would tend to the accomplishment of the municipal duty to provide for the general welfare and safety of the community" (City of Buffalo v Stevenson, 207 NY at 261-262; see Appleton v City of New York, 163 App Div 680, 692 [1914], affd 219 NY 150 [1916]). Indeed, as "[t]he power to regulate the use of the streets is a delegation of the police power of the state government, . . . whatever reasonably tends to make regulation effective is a proper exercise of that power," including the imposition of fees and penalties upon those who impair that use, even if an incidental result is that "the [municipality's] receipts of moneys are increased" (City of Buffalo v Stevenson, 207 NY at 263).
The record reflects that the fees charged for a street permit prior to 2017 — an application fee of $50 for a permit to impede street [*4]access and $25 for one to impede sidewalk access — did not account for the impacts that permitted obstructions could and did have upon both the public's right to use their streets and sidewalks as well as public safety. The Chief of Staff for the City and the Director of Engineering Services in its Department of Public Works both averred how the City experienced a surge in construction activity in 2016 that resulted in the issuance of street permits for large projects that caused street and sidewalk obstructions lasting for months and, in some cases, over a year. Those obstructions impacted the public's ability to safely walk or bicycle, access bus stops and utilize loading zones, and were the subject of numerous complaints to the City. More ominously, the Chief of the City's Fire Department described how the street and lane closures "greatly complicate[d]" the ability of fire trucks and other emergency vehicles to quickly respond to emergencies, and that he was forced to scrutinize street permit applications and monitor the ensuing obstructions to ensure public safety.[FN2] It is therefore apparent that there are costs incurred by the public that relate directly to the issuance of a street permit granting an individual the ability to obstruct streets and sidewalks for his or her own purposes and, as such, respondents were entitled to recover those costs from "the one who derives a benefit from them" as part of the street permit fee (Jewish Reconstructionist Synagogue of N. Shore v Incorporated Vil. of Roslyn Harbor, 40 NY2d at 162; accord Matter of Phillips v Town of Clifton Park Water Auth., 286 AD2d at 834; see City of Buffalo v Stevenson, 207 NY at 262; Matter of Gabrielli v Town of New Paltz, 116 AD3d 1315, 1321 [2014]).
The question therefore turns to whether the design of the new street permit fee structure imposing those costs upon a permit applicant was proper. "A fee charged by a municipality in connection with the exercise of powers delegated to it by the Legislature must be 'reasonably necessary to the accomplishment of the statutory command,' may not be 'open-ended' or potentially unlimited, and must be 'assessed or estimated on the basis of reliable factual studies or statistics'" (Kencar Assoc., LLC v Town of Kent, 27 AD3d 423, 423-424 [2006], quoting Jewish Reconstructionist Synagogue of N. Shore v Incorporated Vil. of Roslyn Harbor, 40 NY2d at 163; see Matter of Phillips v Town of Clifton Park Water Auth., 286 AD2d at 835; New York Tel. Co. v City of Amsterdam, 200 AD2d at 317). Human judgment may nevertheless play a role in the calculation of the fee, and "[e]xact congruence between [the fee and the underlying costs] . . . is not required . . . so long as there exists some rational underpinning for the charges levied" (Watergate II Apts. v Buffalo Sewer Auth., 46 NY2d 52, 59 [1978]; accord Matter of Valentino v County of Tompkins, 45 AD3d 1235, 1237 [2007]; see Suffolk County Bldrs. Assn. v County of Suffolk, 46 NY2d at 621). [*5]It is further worth noting that, as an applicant for a street permit has no right to obstruct the public's use of streets and sidewalks for his or her personal purposes, the fee structure imposed here need not "be scrutinized more carefully for its inhibitions against the pursuit of a right" (Jewish Reconstructionist Synagogue of N. Shore v Incorporated Vil. of Roslyn Harbor, 40 NY2d at 162).
As noted above, the increase in construction projects and resulting disruptions led to the development of the new street permit fee structure, and the Director of Engineering Services explained how the existing fee structure left the City with the unappealing alternatives of either permitting developers to cause significant, open-ended obstructions in streets and sidewalks for a nominal fee or refusing to grant a permit at all and jeopardizing desirable development. The Director of Engineering Services and other City officials accordingly sought a fee structure that would provide the necessary accommodation to developers who needed to temporarily close a street or sidewalk for construction purposes, but also ensure that the developers bore the costs to the public of those closures and had incentives to minimize them. It is further clear that "this was a situation in which both statistical information and human experience played a part" and that determining the public costs incurred for the permit applicant's benefit was necessarily a judgment call, as no dollar value can easily be placed upon the risk faced by a mother forced to push her stroller across a busy street because of a closed sidewalk or a 911 caller forced to wait for a fire truck or ambulance delayed by a closed traffic lane or street (Suffolk County Bldrs. Assn. v County of Suffolk, 46 NY2d at 621).
In calculating those costs, the record reflects that City officials proposed calculating the new fees in part upon estimates of parking revenue that would be lost from street closures. The fee amounts were subsequently adjusted to reflect the City's priority in ensuring pedestrian safety by keeping busy sidewalks open — which was entirely appropriate given that distinctions may be drawn from "objective criteria such as . . . whether [the applicant's proposal involves] residential as distinguished from nonresidential uses" — resulting in higher fees for blocking sidewalks and streets in commercial areas where the obstructions would cause more disruption (Jewish Reconstructionist Synagogue of N. Shore v Incorporated Vil. of Roslyn Harbor, 40 NY2d at 164). The Director of Engineering Services further testified that, although he did not recall whether he had reviewed street permit fee structures adopted by other municipalities at the time the proposed street permit fee structure was being developed, his subsequent review of those structures reflected that they were similar in design to the proposal. The fee structure ultimately developed also left no doubt that the fee was neither unlimited nor [*6]open-ended, but was instead calculated based upon the type and duration of the obstructions. Indeed, in his memorandum describing the proposal to the Board, the Director of Engineering Services cited actual and hypothetical construction projects in the City to illustrate how fees would be calculated and how they could be reduced through changes to a work site plan. There is also no indication that the new street permit fee structure has resulted in a windfall to the City, which has collected an average of $338,000 a year in permit fees since its adoption and incurred $200,000 to $250,000 a year in permit administration costs, a figure that includes neither the costs incurred by the City's Fire Department and other City departments forced to deal with the impacts of permitted obstructions in the course of their work nor the impacts to the public that the structure was intended to ameliorate. In our view, the foregoing amply demonstrated that City officials had a rational basis for calculating the public costs arising from permitted street and sidewalk closures and that the new street permit fee structure imposed a reasonable approximation of those costs upon permit applicants.
Petitioner's response to this showing amounted to complaining that respondents did not analyze the administrative and enforcement costs of issuing and enforcing street permits in devising the new street permit fee structure and that the fees were, for reasons that petitioner's expert did not elaborate, excessive when compared to similar schemes in other municipalities. This missed the point, however, that the fee structure was updated to address the distinct costs borne by the public from the issuance of a street permit that were not accounted for under the original fee structure. Petitioner submitted little to call the calculation of those costs into question. Accordingly, as petitioner failed to raise a question of fact as to the reasonableness of the new street fee structure, respondents were entitled to summary judgment dismissing the challenge to that structure and a declaration that it is valid (see Matter of Howitt Enterprises-Sweden, Inc. v Monroe County Water Auth., 52 AD3d 1233, 1233-1234 [2008]; Kencar Assoc., LLC v Town of Kent, 27 AD3d at 424; compare New York Tel. Co. v City of Amsterdam, 200 AD2d at 318). In view of the foregoing, we need not address respondents' alternate argument as to the validity of the new street permit fee structure.
As the new street permit fee structure is valid, we turn to whether the application of it to petitioner, which resulted in the imposition of a reduced fee of $32,650, is supported by a rational basis in the record (see Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231 [1974]). In that regard, the City's Department of Public Works prepared a detailed invoice in November 2017 describing the basis for its initial fee of $39,200, reflecting [*7]obstructions to eight parking spaces from July 2017 to October 2017, two portions of sidewalk for all of July 2017 and part of August 2017, one portion of sidewalk for the remainder of August 2017 as well as all of September 2017 and October 2017, a street in July 2017 and August 2017 and a travel lane in September 2017 and October 2017. After one of petitioner's members objected, without supporting evidence, that some of the claimed obstructions had not occurred, respondents conducted a further review of their records, determined that there had only been a single sidewalk closure and lane closure for two weeks in October 2017, and accordingly reduced the fee to $32,650. The work site plan submitted by petitioner's contractor with the street permit application contained nothing obviously inconsistent with the remaining obstructions, and they are documented to a large degree in photographs taken by a City Department of Public Works civil engineer who regularly visited the project site for enforcement and documentation purposes. We are mindful that "[j]udicial review of administrative determinations is confined to the facts and record adduced before the agency" (Matter of Yarbough v Franco, 95 NY2d 342, 347 [2000] [internal quotation marks and citation omitted]; see Matter of People v Schofield, 199 AD3d 5, 11 [2021]) and, notwithstanding proof that might support a different result, perceive a rational basis in that record for the amount of the reduced fee.
Finally, Supreme Court properly granted petitioner's cross motion insofar as it sought summary judgment dismissing respondents' counterclaim. Respondents observe that petitioner initially proposed to reconstruct Bool Street as part of its site plan, and they argue that the Planning and Development Board conditioned approval of the plan upon that reconstruction (see General City Law § 27-a [4]). Petitioner presented proof that its initial promise to reconstruct Bool Street related to the installation of a crane pad that would damage the street, an aspect of the project that was abandoned prior to site plan approval. The preliminary and final site plan approvals omitted any explicit condition to perform the reconstruction of Bool Street and, by issuing temporary and final certificates of occupancy for the project, the City necessarily determined that "all improvements required by site plan approval are installed, and . . . any conditions placed on such approval are fulfilled" (Code of City of Ithaca § 276-9). Thus, even accepting that documents prepared during the site plan review process could be read as making the reconstruction of Bool Street a contemplated condition of site plan approval, respondents' subsequent actions reflect that the requirement was waived, and petitioner was entitled to summary judgment dismissing their counterclaim (see Matter of Widmaier v Town of Clarkstown, 208 AD2d 852, 853 [1994]).
Respondents' remaining arguments, to the extent not addressed above, have been [*8]examined and lack merit.
Aarons, Reynolds Fitzgerald and Ceresia, JJ., concur.
Lynch, J. (dissenting).
I respectfully dissent, in part, and agree with Supreme Court's determination that the new fee schedule constituted an unauthorized tax. I readily agree with the majority that respondent City of Ithaca is authorized to regulate temporary disruptions in the use of streets and sidewalks through a permit fee structure (see Municipal Home Rule Law § 10 [1] [ii] [a] [6]; City of Buffalo v Stevenson, 207 NY 258, 261-264 [1913]; New York Tel. Co. v City of Amsterdam, 200 AD2d 315, 317 [1994]). The fees, however, "are restricted to the cost of the service provided to those being regulated" (Matter of Valentino v County of Tompkins, 45 AD3d 1235, 1237 [2007]). Stated another way, "the amount charged cannot be greater than a sum reasonably necessary to cover the costs of issuance, inspection and enforcement" (Matter of Torsoe Bros. Constr. Corp. v Board of Trustees of Inc. Vil. of Monroe, 49 AD2d 461, 465 [1975]; see Suffolk County Bldrs. Assn. v County of Suffolk, 46 NY2d 613, 619 [1979]; Matter of Phillips v Town of Clifton Park Water Auth., 286 AD2d 834, 835 n [2001], lv denied 97 NY2d 613 [2002]; Orange & Rockland Util. v Town of Clarkstown, 80 AD2d 846, 847 [1981]). The point of such fees is to impose "the costs of special services upon the one who derives a benefit from them" (Jewish Reconstructionist Synagogue of N. Shore v Incorporated Vil. of Roslyn Harbor, 40 NY2d 158, 162 [1976] [emphasis omitted]). "The fees . . . should be assessed or estimated on the basis of reliable factual studies or statistics" (id. at 163 [internal quotation marks and citations omitted]). Correspondingly, the fees cannot be exacted as a revenue source to offset general governmental functions (see Matter of Phillips v Town of Clifton Park Water Auth., 286 AD2d at 835).
With these standards in mind, respondents conceded that they had not reviewed the permit program expenses before enacting the new fee schedule. The City's Chief of Staff averred that he initially proposed rates based on "parking revenue estimates," which is not a proper gauge to define the cost of administering the program. The Chief of Staff further averred that "[t]he City's intent in implementing a fee structure was to create an incentive for the developer" to limit the duration and impact on street and sidewalk closures. However understandable that concern may be, the fees must be based on the costs of administering the program. Accounting for the public inconvenience that arises from a street/sidewalk closure plan is an important part of both the site plan approval and permit issuance process, but such an intangible is not calculable as an administrative implementation fee. Nor, for that matter, did respondents demonstrate that the fees would be utilized to offset the costs of the program (compare City of Buffalo v Stevenson, 207 NY at 262-263; 
American Ind. Paper Mills Supply Co., Inc[*9]. v County of Westchester, 65 AD3d 1173, 1175-1176 [2009], lv denied 13 NY3d 716 [2010]). To the contrary, the City Comptroller averred that the street permit fees were "held as revenue until distributed to departments in accordance with the approved budget." The record also shows that the fees collected between July 2017 and December 2019 of $846,893 (an annual average of $338,000) far outpaced the program costs estimated by the Comptroller of approximately $220,000 to $250,000 a year. Given that the fee schedule was not premised on actual costs and generated additional revenues to offset other governmental functions, Supreme Court properly invalidated the fee schedule as an unauthorized tax (see Matter of Valentino v County of Tompkins, 45 AD3d at 1237-1238; Matter of Torsoe Bros. Constr. Corp. v Board of Trustees of Inc. Vil. of Monroe, 49 AD2d at 464-465). Having so concluded, petitioner is entitled to a refund of the $31,347 paid under protest, plus interest (see Video Aid Corp. v Town of Wallkill, 85 NY2d 663, 666 [1995]; Matter of Joy Apts., LLC v Town of Cornwall, 160 AD3d 958, 959-960 [2018]; CPLR 5001, 5002, 5003).
ORDERED that the order and judgment are modified, on the law, without costs, by reversing so much thereof as denied that part of respondents' motion seeking summary judgment dismissing the petition/complaint and granted that part of petitioner's cross motion seeking summary judgment on the petition/complaint; motion granted and cross motion denied to that extent, and it is declared that the new street permit fee schedule is valid; and, as so modified, affirmed.

Footnotes

Footnote 1: Petitioner acknowledged that questions of fact existed as to the extent of the refund due if the new fee schedule were valid and, as such, did not seek summary judgment on its claim for a partial refund.

Footnote 2: The Fire Chief's concerns were not conjectural, as the record shows that he repeatedly raised concerns about the impact the project itself, located a block away from the fire station serving the area, would and eventually did have upon emergency vehicle access. The record contains numerous emails from him, sent throughout 2016 and 2017, in which he described how the obstructions on Bool Street associated with the project would prevent fire trucks from accessing nearby properties in the event of an emergency.